## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MULTI-STATE PARTNERSHIP FOR PREVENTION, LLC, a Maryland Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> DELOITTE CONSULTING, LLP, a Delaware Limited Liability Partnership, <br><br> Defendant, <br><br> And <br><br> DOE INDIVIDUALS I-X, and ROE ENTITIES I-X, <br><br> Defendants. | Case No. 1:24-cv-09013 (PKC) <br><br><br> **THIRD AMENDED COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff, MULTI-STATE PARTNERSHIP FOR PREVENTION, LLC ("***MSPP***"), by and through undersigned counsel, files this Third Amended Complaint against Defendants, DELOITTE CONSULTING, LLP ("***Deloitte***") and currently unnamed DOE INDIVIDUALS and ROE ENTITIES, and alleges the following:

## I.    PRELIMINARY STATEMENT

This is a case about Deloitte's and other defendants' misappropriation and monetization of MSPP's proprietary, confidential and/or trade secret information during the COVID pandemic, resulting in payments to Deloitte and damages to MSPP in excess of $80 million, with the potential under current government contracts of reaching at least $138 million.

MSPP was and is a leading provider of software solutions, which included software named PrepMod, then the only fully-functional mass vaccination management application on the market

**REDACTED**

and used by, *inter alia*, the State of Maryland. When the COVID pandemic arose, the Centers for Disease Control and Prevention ("***CDC***") and Deloitte evaluated PrepMod and engaged with MSPP to discuss potential nationwide implementation. The CDC told MSPP that Deloitte was the CDC's consultant, but MSPP would later learn that Deloitte's role was far more nefarious. Indeed, the CDC had positioned Deloitte to – and Deloitte intended to and did – take MSPP's confidentially-disclosed information and use it to fulfill a government contract for itself, Deloitte. In direct violation of Federal Acquisition Regulations ("***FAR***"; Title 48 of the Code of Federal Regulations), neither Deloitte nor the CDC disclosed Deloitte's undeniable conflict of interest to MSPP. Instead, the CDC and Deloitte gave MSPP the false belief that it was in serious contention for a sizeable CDC contract and urged MSPP to disclose its proprietary technology to them in greater and greater detail.

Critically, prior to gaining access to MSPP's trade secrets and other proprietary and/or confidential information in April and May of 2020, neither Deloitte nor the CDC had presented or circulated any developed specifications for a mass vaccination management application, nor had the CDC broadcast any intent to commission development of such software. Indeed, prior to obtaining access to MSPP's proprietary, confidential and/or trade secret information in the throes of the pandemic, neither the CDC nor Deloitte had any substantive plan, system or workflow for building a mass vaccination management application. And they admitted to MSPP that they had no plan, system or workflow.

The CDC along with employees of Deloitte and other defendants in the presence of MSPP entered into confidentiality and non-use agreements with MSPP to learn the inner workings of PrepMod, which comprised MSPP's trade secrets. Indeed, as a condition for gaining access to MSPP's proprietary information, federal regulations expressly required Deloitte to agree to protect

**REDACTED**

MSPP's information from unauthorized use or disclosure and to refrain from using MSPP's proprietary information for any purpose other than that for which MSPP furnished it.   On information and belief, Deloitte also learned of MSPP's confidential proposal for implementation of PrepMod and quoted costs therefor.   On information and belief, the CDC, Deloitte and other defendants entered into these agreements with the intention of breaching them, and of Deloitte being awarded the contract to provide a vaccination management application to the U.S. Government that would use MSPP's confidential and/or trade secret information about PrepMod.

With MSPP's information in hand, the CDC publicly communicated that it had found a provider for a vaccination management application.   MSPP believed that it was that provider being awarded the CDC's contract.   Instead, the CDC, following a highly unusual and improper secret request for proposal process, awarded the contract to Deloitte, in violation of federal law and regulation, even though Deloitte had no mass vaccination management application and Deloitte's price was about $600,000 more than MSPP's.   The CDC publicly announced on May 28, 2020, that it had awarded the contract to Deloitte.   MSPP was shocked to learn this.

Thereafter, the CDC and Deloitte sought to engage MSPP and its principal, Tiffany Tate, as a consultant to aid Deloitte in creating its software known as VAMS.   VAMS was Deloitte's in-process vaccination management system.   MSPP and Ms. Tate did not agree to consult on VAMS. MSPP had no reason to believe that Deloitte had taken and used MSPP's confidential and/or trade secret information about PrepMod in creating and monetizing VAMS until August, 2020.   This was when it was revealed that Deloitte's VAMS implemented the very same workflow that MSPP had demonstrated to the CDC, Deloitte and other defendants under confidentiality and non-use agreements.

**REDACTED**

Deloitte later tortiously interfered with MSPP's existing contract with the State of Maryland for PrepMod, as well as MSPP's prospective contracts to provide PrepMod to other third parties. Deloitte enticed those customers and prospective customers to engage with Deloitte and obtain VAMS at no charge to them. On information and belief, the CDC, Deloitte and other defendants conspired to engage in anti-competitive practices, namely to stymie and supplant the commercial use and further sale of MSPP's PrepMod, for Deloitte to take over MSPP's market share, and attempt to remove MSPP as the primary vaccine-tracking solution provider. On information and belief, Deloitte entered into additional sole-source contracts with the CDC in connection with VAMS, which, together with Deloitte's initial contract with the CDC for VAMS, resulted in total remuneration to Deloitte of more than $80 million dollars.

On information and belief, Deloitte's misappropriation is far from an isolated incident. On information and belief, Deloitte has been sued several times for misappropriation of trade secrets or other confidential information. MSPP has also been told of other instances of Deloitte misappropriating intellectual property from businesses that were attempting to win government contracts, including in the COVID relief space, so that Deloitte could use that misappropriated intellectual property, for example, to fulfill the contracts itself. To remedy Deloitte's outrageous, unlawful and, *inter alia*, tortious conduct, MSPP has brought this suit.

## II.    PARTIES

1.    Plaintiff, MULTI-STATE PARTNERSHIP FOR PREVENTION, LLC, is a limited liability company having a single member, Ms. Tate, where it is organized under the laws of the State of Maryland, and headquartered therein in Baltimore County, and for purposes of this

**REDACTED**

litigation shall include[1] the actions of any agent, including any licensee, including the Maryland Partnership for Prevention, Inc. and Ms. Tate, who is a citizen of and is domiciled in the State of Florida (collectively "***MSPP***").

2.      Defendant, DELOITTE CONSULTING, LLP, is a limited liability partnership organized under the laws of the State of Delaware and headquartered in New York County ("***Deloitte***" where this term may subsume any agent, affiliate, employee, independent contractor and related).

3.      Defendants, DOES I-X and ROE ENTITIES I-X, the true names and capacities thereof which are presently unknown to MSPP, are sued by such fictitious names ("***Does/Roes***").

## III.    JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action.

5.      First, the Court has original, federal question jurisdiction pursuant to 28 U.S.C. § 1331 over MSPP's claims that arise under federal law: *i.e.*, MSPP's claim under 18 U.S.C. § 1836 *et seq*. (Defend Trade Secrets Act ("***DTSA***")) and MSPP's antitrust claims under 15 U.S.C. §§ 2 and 15.

6.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over MSPP's state law claims because the facts underlying MSPP's state law claims are so related to the facts underlying MSPP's DTSA and federal antitrust claims that MSPP's state law claims form part of the same case or controversy as MSPP's federal claims.

7.      This Court has personal jurisdiction over Deloitte because:  (i), Deloitte agreed in writing to personal jurisdiction in New York in connection with this matter; (ii) Deloitte is a

---

[1] The term "include," in any permutation, including the term "including," shall mean not limited to or without limitation.

**REDACTED**

Delaware limited liability partnership, which means that its citizenship is determined by the citizenship(s) of each of its partners, at least some of whom, upon information and belief, reside and work in New York, including in New York County; and (iii) Deloitte transacts business in the State of New York.

8.      The true names and capacities of the defendants designated herein as Does/Roes are at this time presently unknown to MSPP, which therefore sues said defendants by such fictitious names where the Does/Roes defendants are alleged to have conspired, directed, or otherwise participated with Deloitte in the misappropriation described herein.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 at least because Deloitte resides in this judicial district.

## IV.    FACTUAL BACKGROUND

### A.    2017-2020: MSPP's Award-Winning Companion Software (ReadiConsent and ClinicWizard  Software)

10.      MSPP was and is a 100% minority-owned business since its only member, Ms. Tate, is African-American, and has committed herself to working in and for public health for approximately thirty (30) years.

11.      In and after August, 2017, MSPP created, owned and sold companion software, *i.e.*, the Readi-Consent and ClinicWizard software (the "***RC-CW Software***"), that combined are a mass vaccination tool.

12.      In May, 2018, the National Adult and Influenza Summit, which is co-sponsored by the CDC, recognized the RC-CW Software with an award for innovation and technology in the field of immunization.

13.      From in or around 2018 to 2020, Ms. Tate discussed at length with individual leaders at state health departments and the CDC the possibility of them purchasing a national

**REDACTED**

license of the RC-CW Software, especially in light of procurement challenges states were experiencing in purchasing software without a bid process.

14.    In December 2019, the CDC, an operating division within the U.S. Department of Health and Human Services ("***HHS***"), an agency of the U.S. Government, suggested to Ms. Tate that MSPP form a consortium to convene approximately thirty (30) states that were interested in purchasing the RC-CW Software.

15.    On January 21, 2020, said consortium first met, and the CDC knew that said consortium had formed for the purpose of pursuing a national license for the award-winning RC-CW Software.

**B.    Circa 2020: COVID Erupts and Responses Thereto**

16.    In December 2019, patients in Wuhan, the Hubei province of China, were reportedly the first to contract coronavirus disease, *i.e.*, COVID, an infectious disease caused by the SARS-CoV-2 virus.

17.    On or around January 20, 2020, the CDC reported the first laboratory-confirmed case of COVID in the United States in the State of Washington.

18.    On January 30, 2020, the World Health Organization ("***WHO***") declared COVID a "Public Health Emergency of International Concern."

19.    On February 27, 2020, and due to mounting worries about the COVID outbreak, various U.S. stock market indices, including the NASDAQ-100, the S&P 500 Index, and the Dow Jones Industrial Average ("***Dow***") posted their sharpest falls since 2008, with the Dow suffering its largest one-day drop since the 2008 financial crisis.

20.    By February 27, 2020, Ms. Tate, in a culmination of decades of working in public health and experience with inventing and selling the RC-CW Software, conceived and invented

**REDACTED**

PrepMod, an emergency preparedness module, that would solve the deficiencies Ms. Tate encountered in the health industry and help automate key aspects of tracking and delivering mass vaccination in various clinical and non-clinical settings.

21.    Readi-Consent and ClinicWizard, individually, and together, *i.e.,* the RC-CW Software, pre-dated and are different from PrepMod.

22.    On March 11, 2020, WHO declared the COVID outbreak a global pandemic.

23.    By said date, MSPP was well-positioned to deal with the pandemic response (at least in the United States) by selling or licensing PrepMod.

24.    MPP, the Maryland Partnership for Prevention, a non-profit entity with a fully functioning board of directors dedicated to providing public health services tailored to the needs of state pandemic vaccination initiatives, where Ms. Tate acted as an officer, had license to sell PrepMod.

25.    On March 13, 2020, Ms. Tate initially contacted the CDC about using PrepMod to manage the unfolding pandemic.

26.    By April 2, 2020, the CDC commissioned a third party, the American Immunization Registry Association ("***AIRA***"), as an agent to survey the Immunization Information System ("***IIS***") Managers and Immunization Program Managers across the United States and its territories that would culminate in a report to address "mass vaccination response capabilities and considerations" during the COVID public health emergency.

27.    On or around April 6, 2020, and after AIRA had "identified [MSPP] as having a mass vaccination module," AIRA contacted Ms. Tate to request "a basic demonstration of [MSPP's] module/mass vaccination solution along with a discussion about [MSPP's] system's capabilities and reporting options."

**REDACTED**

28.    The MSPP "solution" and technology that AIRA had identified was the RC-CW Software.

29.    Up to and around April 15, 2020, MSPP continued to enhance the functionality and features of PrepMod to support an automated, large-scale response to the evolving pandemic.

30.    On April 20, 2020, during a call of U.S. national immunization leadership, a director at a branch of the CDC known as the Immunization Information Systems ("**CDC-IIS**") learned from a CDC regional director, Greg Reed, who was also the CDC-assignee to the Maryland Department of Health as well as an affiliate of a national public health membership organization, the Association of Immunization Managers ("**AIM**"), about the award-winning RC-CW Software and how at least the State of Maryland had endorsed said software.

31.    On said date and within minutes of learning of said award-winning companion software, *i.e.,* the RC-CW Software, the CDC-IIS Director, Lynn Gibbs-Scharf, MPH ("**Gibbs-Scharf**"), obtained Ms. Tate's contact information and contacted her with urgency requesting a demonstration.

32.    On April 21, 2020, Ms. Tate gave to a small number of AIRA representatives a live demonstration of the RC-CW Software.

33.    While Ms. Tate did not give the AIRA representatives a live demonstration of PrepMod during said meeting, Ms. Tate disclosed to AIRA's representatives the existence of PrepMod and talked about a subset of PrepMod's features.

34.    As she did with the AIRA presentation, it was Ms. Tate's practice that before she would disclose MSPP's proprietary, confidential and/or trade secret information, including about PrepMod, she advised her audience that the impending disclosure would comprise proprietary and

**REDACTED**

confidential information that was owned by MSPP and was not to be made public or used without MSPP's express authorization.

35.    Prior to Ms. Tate making disclosures about the RC-CW Software and PrepMod to the select group of AIRA representatives on April 21, 2020, those AIRA representatives agreed to Ms. Tate's terms, including to keep Ms. Tate's disclosures confidential.

36.    On or around April 21, 2020, the CDC was desperate to fix its leadership problems during the pandemic, to remedy the ubiquitous conclusion that "[CDC] had let [the public] down" with COVID and that its "response would go down in history as a profound failure" since leaders in the medical field viewed "C.D.C. [as] no longer the reliable go-to place."[2]

37.    Also, in anticipation of approval of one or more COVID vaccines in development, the CDC was also desperate to find a way to address vaccine registration, administration and reporting on a national scale.

38.    Around this time in 2020, with its PrepMod software, MSPP offered full, national implementation months before the anticipated delivery of the first COVID vaccines.

39.    The CDC's implementation of PrepMod would have allowed all states to use the same system to track vaccine inventory and vaccine administration, giving the CDC a real-time accounting of the progress of the pandemic response and resource needs.

40.    On April 22, 2020, Ms. Tate and CDC-IIS Director, Gibbs-Scharf, agreed to conduct a ninety (90) minute zoom meeting on April 24, 2020, that was delayed three days to April 27, 2020.

41.    On about April 25, 2020, AIRA, in its CDC-commissioned report entitled "Mass

---

[2] *The CDC Waited Its Entire Existence for this Moment: What Went Wrong?* available at https://www.nytimes.com/2020/06/03/us/cdc-coronavirus.html, last visited Jan. 17, 2025.

**REDACTED**

Vaccination Quick Survey of IIS Community," concluded that MSPP had the *only* functioning and fully-developed bi-directional mass vaccination application commercially available to address mass vaccination. Said application was the RC-CW Software.

42. Also in its CDC-commissioned report, AIRA noted other available or in-process modules or applications that were used on strictly local levels, were uni-directional, and/or which would require significant augmentation and modification to be used even for limited purposes, on a larger, *i.e.*, nationwide, scale. AIRA based its assessment and recognition of the limitations of these other efforts in or attempting to enter the marketplace on 50 responses to its inquiries, representing forty-nine (49) jurisdictions across the United States and its territories.

43. On April 27, 2020, Ms. Tate met virtually with Gibbs-Scharf, other CDC staff and Deloitte. During that meeting, Gibbs-Scharf told Ms. Tate that Deloitte and its agents were "consultants" for the CDC. Gibbs-Scharf also told Ms. Tate to engage with Deloitte concerning MSPP's PrepMod.

44. During said April 27, 2020 meeting, Ms. Tate gave a slide presentation comprising information about the RC-CW Software and PrepMod, and she also gave a live demonstration of PrepMod, during which she disclosed trade secrets and other proprietary and confidential information of MSPP.

45. MSPP's disclosures to the CDC and Deloitte in said April 27, 2020 meeting were quite specific and technical, and said disclosures were different from and went well beyond what MSPP had disclosed to AIRA in said April 21, 2020 meeting.

46. Ms. Tate's presentation in said April 27, 2020 meeting to the CDC and Deloitte included a workflow that consisted of a process containing MSPP's trade secrets and other proprietary and confidential information.

**REDACTED**

47.    During said meeting, Gibbs-Scharf was highly enthusiastic about the existence and functionalities of PrepMod, and after the live demonstration, she was quite eager to pursue discussions with MSPP.

48.    Upon information and belief, the CDC and Deloitte were expecting to see only the RC-CW Software demonstrated and not PrepMod.

49.    Upon information and belief, the CDC and Deloitte were surprised to learn about the existence of PrepMod and its vast capabilities.

50.    Upon information and belief, the CDC and Deloitte had not even anticipated all of the problems that PrepMod was built to solve, nor the solutions to those problems.

51.    Upon information and belief, the CDC and Deloitte used said meeting with Ms. Tate—and other meetings thereafter—to be educated exhaustively on all things salient to vaccine administration management. For example, on information and belief, the CDC and Deloitte used their meeting with Ms. Tate to learn about: (i) the deficiencies Ms. Tate identified in industry; (ii) the solutions PrepMod provided thereto; (iii) the confidential features and considerations taken into account in PrepMod and its interface as part of providing those solutions; and (iv) all the trade secret and other confidential information about how PrepMod's workflow and underlying structure provided those solutions to ultimately result in a novel, massive improvement—a real-time, all-encompassing and unified end-to-end system, with significant gains in efficiency, data insight/analysis and accessibility, over any other known approach, tool or system for mass vaccination preparedness, tracking, and monitoring.

52.    The CDC admitted to MSPP during the April 27, 2020 meeting that the CDC had no existing or conceived system or plan—or prior knowledge of one—to address mass vaccination,

**REDACTED**

much less one that would support the demonstrated workflow, efficiencies, and breadth that Ms. Tate had confidentially shared with it, its representatives and its consultants, Deloitte.

53.     Deloitte did not disagree with the CDC's admissions.

54.     During this and subsequent presentations, all MSPP's proprietary and confidential information disclosed was identified as being proprietary and confidential and not to be used, and any documentation, such as slides comprising such information, were conspicuously marked: "CONFIDENTIAL & PROPRIETARY—DO NOT SHARE."

55.     Prior to Ms. Tate sharing her slides and engaging in discussions about trade secret and other confidential aspects of MSPP's technology, including PrepMod, the CDC, Deloitte and other defendants agreed to her stated terms, including the maintaining of confidentiality of the disclosures.

56.     Absent the CDC and Deloitte's agreement to maintain confidentiality of the impending disclosures, Ms. Tate never would have shared MSPP's trade secret or other confidential information with them.

57.     Furthermore, as an existing consultant and contractor to the CDC, Deloitte was expressly required by federal regulation to agree to protect any MSPP proprietary and/or confidential information to which Deloitte received access from unauthorized use or disclosure and to refrain from using MSPP's information for any purpose other than that for which MSPP furnished it. FAR §§ 9.505-4(b), 9.508(h).

58.     Deloitte did so agree to protect MSPP's proprietary trade secret and confidential information.

**REDACTED**

59.     Similarly, CDC was obligated by federal regulation to require Deloitte to enter into confidentiality and nonuse agreements with MSPP and to ensure Deloitte's compliance. FAR §§ 9.505-4(b), 9.508(h).

60.     At least the CDC, Deloitte and MSPP had thus developed a relationship of confidentiality in connection with MSPP's PrepMod, the RC-CW Software, and MSPP's capabilities for fulfilling the CDC's need to obtain a pandemic preparedness and vaccine administration and tracking tool.

61.     At the end of MSPP's presentation, the CDC requested to meet with MSPP's technical team, view screenshots, obtain access to PrepMod and otherwise "fiddle around" with it.

62.     The following day, April 28, 2020, the CDC, upon information and belief with Deloitte's knowledge, emailed MSPP an urgent request for a follow-up meeting, reiterated its request to meet with MSPP's technical team, requested a "sandbox or at least screenshots" of PrepMod, and memorialized a previous verbal inquiry about the cost of PrepMod.

63.     The term "sandbox" is commonly used to refer to a testing environment in which code or software can be examined in a safe, secure and non-public way.

64.     The CDC's and Deloitte's repeated requests for a sandbox further evidenced their recognition of the proprietary, confidential and/or trade secret nature of MSPP's PrepMod and any related information.

65.     On April 28, 2020, Ms. Tate sent to only the CDC a "Confidential" message detailing the pricing, scope of work, and partnerships for nationwide implementation and use of PrepMod.

66.     Also on April 28, 2020, Ms. Tate identified to the CDC part of MSPP's technical team, and the CDC again requested cost information, which she provided that same day.

**REDACTED**

67.     Upon information and belief, the CDC shared with Deloitte at least MSPP's confidential proposal and pricing information.

68.     On May 1, 2020, the CDC's Gibbs-Scharf emailed a meeting request to an individual on MSPP's technical team (but not to Ms. Tate) "to discuss technical specs for PrepMod and related modules."

69.     When said individual informed Ms. Tate about this direct outreach from the CDC without it copying Ms. Tate, she advised him to cancel the meeting in favor of a time when she could attend the meeting.

70.     On May 4, 2020, Ms. Tate sent to the CDC screenshots of PrepMod with detailed explanations, which she marked as "CONFIDENTIAL & PROPRIETARY—DO NOT SHARE," per MSPP's usual practice.

71.     Upon information and belief, the CDC shared MSPP's PrepMod screenshots and information with Deloitte.

72.     On May 5, 2020, the CDC met with MSPP's technical team and Ms. Tate, despite previously trying to exclude her (the "***May 5th Meeting***").  A lead from the CDC's technical team attended the meeting and attempted to extract from MSPP, MSPP's proprietary, confidential and trade secret information.

73.     On information and belief, Deloitte was aware and/or involved in the CDC's attempt to extract that information from MSPP at the May 5th Meeting.

74.     During the May 5th Meeting, MSPP was asked about, *inter alia*, PrepMod's architecture, technical approach and coding language. MSPP fully answered the questions asked, and provided the CDC, pursuant to their confidentiality agreement, with further detailed and technical specifications of PrepMod.

**REDACTED**

75.     As Ms. Tate detailed the specifications of PrepMod, she delineated to the CDC concrete plans for expeditious scaling and a national roll-out that involved existing partnerships with AIM and the national software firm, Fearless Solutions, LLC ("*Fearless*").  Fearless had extensive experience with government agencies, including contracts with the CDC working on, *inter alia*, immunization-related and data repository systems.

76.     Neither during nor after the May 5th Meeting did the CDC:  (i) ask any follow-up questions; or (ii) question or challenge either MSPP's abilities or MSPP's planned partnership's abilities to handle a national rollout.

77.     Prior to and during the May 5th Meeting, Ms. Tate asked the CDC if it had any plans for handling public registration and vaccine reporting for COVID vaccinations, and the CDC specifically represented **again** that it did **not** have such a plan, system or **any** workflow or knowledge thereof.

78.     These representations by the CDC were later confirmed in a different AIRA report (July, 2020), which indicated the CDC was only just then initiating development of a new mass vaccination tool/platform called the Vaccine Administration Management System ("*VAMS*")— again, nonexistent before any confidential discussions with MSPP and the CDC and Deloitte's access to MSPP's trade secrets and other confidential information.

79.     On May 6, 2020, pursuant to their agreements of confidentiality and non-use, Ms. Tate again presented to the CDC more details of PrepMod's technical infrastructure.

80.     By this point, the CDC, Deloitte and other defendants had obtained confidential access to significant confidential, proprietary and trade secret information of MSPP concerning PrepMod.  Many of the disclosures of the confidential, and especially trade secret information were verbal, through interactive discussion, with the CDC and Deloitte asking questions, including

**REDACTED**

at times very technical questions, to elicit disclosures from MSPP.  Presentations, including live demonstrations, involved sharing of portions of the PrepMod infrastructure, behind-the-scenes functionality and administrative features that are never available or known to users.  Verbal disclosures also complemented and augmented the confidentiality-marked PowerPoint presentations that were provided.

81.    PrepMod is a tool that is designed for pandemic preparedness, and it is different from, though can work in conjunction with, the RC-CW Software.

82.    The trade secrets concerning PrepMod that MSPP contends were disclosed to the CDC and Deloitte with the CDC and Deloitte's promises and agreements of maintaining their confidentiality and non-use were not present in the RC-CW Software, which were community-based tools.

83.    MSPP's trade secrets concerning its proprietary PrepMod mass vaccination management technology include information that MSPP divulged pursuant to its confidentiality and nonuse agreements with the CDC, Deloitte, and other defendants, including information concerning, for example, the architecture, formulas, designs, software, programs, workflow, data compilations, specifications, and technical methods, processes, and techniques underlying the functionality, design, and implementation of its PrepMod application and related features and services.

84.    MSPP also divulged, pursuant to its confidentiality and nonuse agreements with the CDC, Deloitte, and other defendants, confidential information concerning its proprietary PrepMod SaaS (Software as a Service), that was confidential at the time, and that would become public only once PrepMod was later used by licensees pursuant to license.

**REDACTED**

85.     On information and belief, the CDC's and Deloitte's access to even this confidential information, months in advance of it ever becoming publicly available to MSPP's licensees, enabled Deloitte to more expediently develop and incorporate MSPP's trade secrets into Deloitte's ultimate VAMS tool.

86.     In particular, MSPP disclosed and discussed with the CDC and Deloitte certain trade secret information concerning the means by which features of PrepMod were implemented, how they were interconnected within the PrepMod architecture and their use and function within the program itself.

87.     The trade secret information MSPP disclosed to the CDC and Deloitte concerning PrepMod comprised information that eventual users of PrepMod would not have been able to discern simply by using PrepMod.

88.     One such trade secret pertained to the architecture and accessibility of the PrepMod system, and the treatment and hosting of the data ████████████████████ ███████████████████████████████ This feature is something that could not be discerned by an outsider viewing or using PrepMod even though its misappropriation and use eventually by Deloitte in VAMS could be publicly discerned.

89.     Said aspect of PrepMod was revolutionary in itself, and it represented a significant advancement over the architecture of the more primitive vaccination management tools in place on local levels—if at all—prior to PrepMod.

90.     As AIRA revealed in one of its reports, and on information and belief, local systems that existed prior to PrepMod were isolated and disjointed.  But for the RC-CW Software, sharing data between such systems was uni-directional and for the more advanced of such systems, required manually performing an "API call" between systems to transmit data. Data shared

**REDACTED**

between systems was unlikely to be in the same format because there was no standardization among systems.  Vaccine management technology prior to PrepMod lacked even the basic building blocks of a nationwide vaccine management system.

91.       PrepMod's end-to-end nature—which was unique at least in that it █████
███████████████████████████████████████████████████████████████████████████
███████████████, all in one SaaS—was realized ██████████████████████████████ trade secrets.

92.       Prior to public access gained pursuant to PrepMod's first licensing in August of 2020, the aforementioned concepts of ████████████████████████████████████
███████████████, and the integration and efficiencies entailed, were all non-public, confidential information that were disclosed to the CDC and Deloitte,  which disclosure provided Deloitte a significant jumpstart toward—and a roadmap for—the building of VAMS.  One such additional then-confidential efficiency was that ████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████.

93.       But *how* this unification and these efficiencies were achieved, architecturally within PrepMod, were trade secrets that Ms. Tate disclosed to the CDC and Deloitte pursuant to their confidentiality and non-use agreements.

94.       Ms. Tate also disclosed and discussed in detail the trade secret that (and architecturally *how*) PrepMod employed ██████████████████████████████████████
█████████████████████████████████████████.  This too was invisible to the user or licensee.



**REDACTED**

95.     Ms. Tate also disclosed and discussed in detail the trade secret that (and *how*) PrepMod enabled ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ enabled (and would have enabled for the CDC) a meaningful aggregation of data across jurisdictions, and ████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████.

96.     MSPP also confidentially disclosed to the CDC and Deloitte that, aligned with and in part enabling the end-to-end system, PrepMod comprised ████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████ within PrepMod were confidential at the time of disclosure to the CDC and Deloitte (and for many months thereafter) and provided Deloitte a significant jumpstart in its development of VAMS.

97.     MSPP also disclosed to the CDC and Deloitte the trade secret of PrepMod having ███████████████████████████████████████████████████████████████

**REDACTED**

This aspect was invisible to and would not have been known by or accessible to a user. Further, *how* ████████████████████████ was architecturally achieved and for what purposes and added capabilities it provided in PrepMod were also trade secret information that MSPP disclosed to the CDC and Deloitte pursuant to their agreements of confidentiality and non-use.

98.    MSPP also discussed in full and showed Deloitte Prep-Mod's back-end developer interface, which itself was a Prep-Mod trade secret. This again was something that a user or licensee would never see or learn the details of by virtue of using PrepMod. MSPP's disclosure of these trade secrets included the actions that could be undertaken at the developer end, both ████████████████████████████████████████████████████ ████████████████████████████ .

99.    The implementation and functionality of each of the foregoing pieces of confidential information, along with the individual trade secrets as identified above, together comprise a unique combination trade secret, that achieves the end-to-end and real-time functionality of PrepMod. This combination provides significant economic and competitive advantage. By misappropriating MSPP's confidential and trade secret information, Deloitte obtained this advantage for VAMS and attempted to monopolize and did dominate the market.

100.    None of these features of ████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████ , comprising PrepMod's first-of-a-kind, ████████████████ end-to-end system, were present in the RC-CW Software that MSPP had already created and commercialized for community efforts.

**REDACTED**

101.    On May 11, 2020, less than one week after representing that it had no plan, no workflow, no system, and no knowledge of one, the CDC announced during a meeting that it had a "draft" workflow and announced its intention to build a "mass vaccination app."

102.    During said May 11th meeting, the CDC presented a draft workflow of its planned mass vaccination management application ("***CDC's Draft Workflow***").

103.    Upon information and belief, Deloitte authored or helped to author the CDC's Draft Workflow.

104.    From at least May 11, 2020, until on or around May 27, 2020, the CDC publicly was stating in various forums that: (i) it was going to be providing a mass vaccination app; (ii) a "vendor" already had been identified, and (iii) the CDC would release said vendor's name "soon."

105.    From at least May 11, 2020 to May 27, 2020, Ms. Tate believed that the CDC intended to engage MSPP for use of PrepMod, and that MSPP was the vendor the CDC had identified.

106.    During this time, third parties and other individuals from the CDC advised Ms. Tate that they also believed that MSPP's PrepMod was going to be selected to fulfill the CDC's contract. Members of the CDC staff also conveyed to Ms. Tate that they had neither seen nor heard of the CDC's Draft Workflow prior to its release.  One member of the CDC staff also advised of his understanding that there was no prior plan or system in place at the CDC for addressing mass vaccination.

107.    From at least May 11, 2020, until on or around May 27, 2020, when discussing the CDC's planned vaccination application and impending announcement of the CDC's selected vendor, the CDC never disclosed to Ms. Tate (nor to other national players in the immunization space) that the CDC had opened a competitive bid process -- or that one was even contemplated.

**REDACTED**

108.    On May 14, 2020, Gibbs-Scharf executed a Justification and Approval ("***J&A***")
identifying Deloitte as the only contractor that could complete within **two (2) months** a "robust"
vaccine administration tracking application for nationwide use.

109.    A typical J&A is a document required to justify and obtain appropriate level
approvals for the CDC to contract without providing for full and open competition as required by
FAR.

110.    The May 14, 2020 J&A purported to offer the CDC's justification for awarding the
contract to Deloitte, namely that Deloitte had a proprietary Salesforce CRM (Customer Relation
Management) platform that allegedly made Deloitte "uniquely qualified to support vaccine
tracking."

111.    MSPP had previously conveyed to the CDC and defendants that MSPP planned to
partner with two competent national organizations to scale PrepMod and provide for its nationwide
rollout.  No one—not Gibbs-Scharf, any other agent of the CDC, or anyone from Deloitte—ever
sought to discuss with MSPP any details of, concerns about, or suggestions for, MSPP's
nationwide rollout plan for PrepMod.

112.    The J&A, as approved by Gibbs-Scharf, asserted that Deloitte had at some point,
prior to May 19, 2020, demonstrated a "vaccine tracking application **mockup**" built on a
Salesforce CRM platform. (Emphasis added.)

113.    The J&A also referred to a "Microsoft - lab testing application" built on a CRM
platform called Dynamics.   The J&A compared Microsoft Dynamics to Salesforce's CRM
platform and noted Salesforce (which was the platform hosting Deloitte's GovConnect framework)
had higher overall ratings.

**REDACTED**

114.    The J&A did *not* cite to AIRA's finding in its CDC-commissioned report that MSPP had the only functioning and fully-developed bi-directional mass vaccination application commercially available.

115.    The J&A failed to address anything at all concerning the actual availability, functionality and scope of vaccine administration and emergency preparedness, and instead, the J&A centered on a comparison of hosting platforms.

116.    Upon information and belief, the CDC intentionally made the above-identified material misrepresentation and omissions from the J&A.  Upon information and belief, those misstatements and omissions were made with the knowledge of Deloitte.

117.    On information and belief, the J&A's misrepresentations and omissions are highly suspect and misrepresent the reality that MSPP was the only entity with an emergency preparedness SaaS, and that MSPP had the resources to support and was ready for nationwide roll-out of this end-to-end vaccination management solution.

118.    On May 19, 2020, the J&A was ratified by two other individuals.

119.    At all times relevant, the CDC did not make public the J&A—in violation of federal law and regulations that provide that national security and public interest are the only exceptions to the requirement for publishing J&As.  *See, e.g.*, 41 U.S.C. §§ 3301, 3304; FAR §§ 6.301-6.305, 15.201.  Such exceptions did not apply to the CDC's J&A here.

120.    Despite having a ratified J&A, the CDC instead elected to institute a request for proposal that customarily would have opened a bidding process to all qualified contractors or vendors, including MSPP.

**REDACTED**

121.    Prior to May 19, 2020, the CDC had a history of disclosing to MSPP (and for thoroughness, MPP and Ms. Tate) contemplated and pending request for proposals (as was consistent with the CDC's custom and rules and regulations).

122.    On May 19, 2020, contrary to both custom and federal law and regulations, the CDC did not inform MSPP of a solicitation that had commenced that day, Request for Proposal ID: 75D30120R67989 that would last for approximately eight (8) days (the "***Secret RFP***").  *See, e.g.*, 41 U.S.C. §§ 3301, 3304; FAR §§ 15.201, 15.203.

123.    Between May 19, 2020 and on or around May 27, 2020 ("***Secret RFP Open Period***"), again contrary to both custom and federal law and regulations, the CDC did not disclose on regular conference calls to national players in the immunization space any reference of the open bid, *i.e.*, the Secret RFP.  *See, e.g.*, 41 U.S.C. §§ 3301, 3304; FAR §§ 15.201, 15.203.

124.    Although the CDC received communications from Ms. Tate about PrepMod during the RFP Open Period, the CDC did not alert Ms. Tate that there was a pending RFP.

125.    Rather, during the Secret RFP Open Period, the CDC ignored all communications from Ms. Tate, which was a radical departure from its responsiveness to Ms. Tate prior to the release of the Secret RFP.

126.    On May 22, 2020, three days after the CDC released the Secret RFP (unbeknownst to MSPP), Ms. Tate confidentially disclosed to the CDC that MSPP had added to PrepMod the then-latest enhancements, including a new feature that she described in detail.

127.    She made that disclosure based on their agreements of confidentiality and non-use and her understanding that MSPP was going to be the contract awardee.

128.    The CDC never responded to Ms. Tate's May 22 message.

**REDACTED**

129.    On May 27, 2020, Ms. Tate sent a message to the CDC, following up on the message she had sent on May 22, 2020.

130.    The CDC failed to respond to Ms. Tate's May 27 message.

131.    Also on May 27, 2020, the CDC privately awarded to Deloitte—the sole bidder—a one-year contract for $15,891,816.74, essentially to provide a mass vaccination application that would replicate and misappropriate MSPP's PrepMod technology.

132.    The amount of the Award was only about $600,000 more than what MSPP confidentially quoted to the CDC for a license to PrepMod.

133.    On May 28, 2020, the CDC publicly disclosed Award ID 75D30120C08239, wherein it awarded the mass vaccination application contract to sole-bidder Deloitte ("*Award*").

134.    Also on May 28, 2020, Gibbs-Scharf participated in a call involving national players in the immunization space.  In response to a direct question from a participant, after hesitating, Gibbs-Scharf announced that the CDC had chosen Deloitte to build the mass vaccination app, which would eventually be termed VAMS.

135.    Using a graphic, Gibbs-Scharf explained that VAMS would be used for two phases of the pandemic response, estimated to last approximately nine (9) months, and that there would be a third phase.

136.    Gibbs-Scharf did not, during said national call, disclose the Secret RFP process.

137.    Ms. Tate was shocked during said national call to learn that the CDC had chosen Deloitte, and not MSPP.

138.    Since the CDC still did not disclose that it had engaged in a Secret RFP process, Ms. Tate concluded that the CDC had simply added funds to an existing contract with Deloitte that allowed Deloitte to do the work without the CDC holding a competitive bidding process.

**REDACTED**

139.    In or around early June 2020, the CDC and Deloitte publicly announced that Deloitte would complete a mass vaccination application within two (2) months.

140.    Sometime in June 2020, Ms. Tate, along with others in the immunization space, learned that the Award was not from a sole-source contract (since there was only a single bid), but rather, from the Secret RFP.

141.    On or around June 26, 2020, after Deloitte had misappropriated MSPP's proprietary, confidential and/or trade secret information, Deloitte encountered numerous problems due to, upon information and belief, using a CRM platform that was not ideal for incorporating the technology it had misappropriated from MSPP.

142.    Upon information and belief, in response to the need to correct said problems, Deloitte sought to have a discussion with Ms. Tate about her working with Deloitte to develop VAMS.  As part of that discussion, Deloitte seemingly worked to dissuade Ms. Tate from focusing further efforts on PrepMod and its licensing and nationwide implementation, and Deloitte's agent told Ms. Tate and thus MSPP, "You are not a software company."

143.    On the same day, Deloitte  asked Ms. Tate to execute an NDA that also contained a release of certain claims, and which she refused to sign.

144.    In July 2020, and during another national call of immunization leaders and decision-makers, the CDC refused to respond to the question, "Why didn't CDC just buy PrepMod?"

145.    Also in the report dated July 2020, AIRA summarized its investigation across the United States and its territories, which revealed MSPP had the only emergency preparedness tool available.

**REDACTED**

146.    AIRA's investigation also identified other local users of self-developed or procured mass vaccination modules but which were limited and again not comprising an emergency preparedness tool.

147.    In its publications resulting from its 2019 engagement by the CDC, AIRA never mentioned Deloitte, let alone identified it as having any technology relevant to mass vaccination solutions.  The absence of Deloitte having any tool in this regard is further apparent from the J&A, which refers only to Deloitte's alleged "mockup."

148.    The reference to this Deloitte "mockup" post-dated Deloitte's access to MSPP's trade secrets and confidential information, and the numerous presentations and technical discussions of MSPP's trade secret and confidential information, all pursuant to the agreements of confidentiality and non-use between Deloitte and MSPP.

149.    On August 5, 2020, at the request of Operation Warp Speed ("*OWS*"),[3] Ms. Tate met with various members of OWS, CDC and BARDA to discuss PrepMod in a 30-minute meeting that turned into a 90-minute meeting, in view of how impressed the attendees were with PrepMod.

150.    On August 7, 2020, one of the proprietary PrepMod features that Ms. Tate had demonstrated to the CDC was revealed to have been incorporated into VAMS, as reflected in a VAMS Information Sheet disseminated by the CDC.

151.    Deloitte's incorporation into VAMS of said feature and multiple other trade secrets and confidential information that MSPP had disclosed to the CDC and Deloitte, enabled VAMS to compete with PrepMod for non-CDC contracts as well.

---

[3] OWS was formed to encourage private and public partnerships to enable faster approval and production and distribution of vaccines during the pandemic and consisted of an interagency program among multiple U.S. agencies, including HHS, which also subsumed the Biomedical Advanced Research and Development Authority ("*BARDA*"), an office responsible for the procurement and development of medical countermeasures, principally against bioterrorism, but also including pandemic threats as well, including COVID. Said other agencies included the Food and Drug Administration, the Department of Defense, the Department of Energy and more. In February, 2021, OWS was transferred into the responsibilities of the White House COVID-19 Response Team.

**REDACTED**

152.    Though the J&A represented that Deloitte would complete VAMS within two months, on or around August 31, 2020, Deloitte represented that VAMS was not yet complete and compared its current status to the CDC's Draft Workflow when it was presented again. Deloitte also presented its then-current workflow of VAMS.

153.    Without authorization from MSPP, the CDC made VAMS available to all states at no charge.

154.    At the time, MSPP charged a fair-market fee plus annual maintenance for a license for PrepMod that yielded substantial revenue.

155.    In 2020, the State of Florida had represented that it was strongly considering purchasing PrepMod via a contract with MSPP worth approximately $1,200,000, but instead decided to use VAMS.

156.    On August 27, 2020, during a national conference call attended by immunization program managers from across the country, agents of the State of Florida represented that the State would have purchased PrepMod but decided to use VAMS instead since "it does everything that PrepMod does" without any cost to Florida.

157.    On information and belief, Deloitte and other defendants interfered with MSPP's prospective PrepMod contract with the State of Florida.

158.    To the present day, the State of Maryland has stopped paid use of PrepMod and switched to VAMS citing its lack of cost (to Maryland) despite objection by Maryland counties and users alike.

159.    On information and belief, Deloitte and defendants interfered with MSPP's PrepMod contract with the State of Maryland.

**REDACTED**

160.    On August 30, 2020, MSPP placed the CDC and Deloitte on notice that they had, *inter alia*, misappropriated MSPP's proprietary, confidential and/or and trade secret information, and legally required both the CDC and Deloitte to preserve, *inter alia*, all documents relevant to this matter.

161.    To the present day and without any authorization from MSPP, Deloitte improperly continues to use VAMS and make it available to the public.

162.    In light of Deloitte's true, yet concealed, status as MSPP's commercial rival and the CDC's always-intended awardee of the CDC contract, Deloitte had clear, substantial conflicts of interest in participating in CDC's communications with MSPP and in receiving access to MSPP's proprietary, confidential and/or and trade secret information.  *See* FAR §§ 9.500-9.508.

163.    Although both Deloitte and CDC knew about these conflicts of interest, they improperly never disclosed them to MSPP, nor did they impose appropriate restrictions or take other precautions necessary to protect MSPP's proprietary, confidential and/or and trade secret information from misappropriation by Deloitte or to otherwise prevent Deloitte from gaining an unfair advantage.  FAR § 9.505.

164.    In violation of federal regulations, including at least FAR § 9.505, Deloitte concealed its conflicts of interest from MSPP, improperly used the leverage of the CDC contract to fraudulently obtain access to MSPP's proprietary, confidential and/or and trade secret information regarding PrepMod, and then exploited its resulting unfair competitive advantage to unlawfully take, use, and monetize MSPP's intellectual property to develop and produce VAMS, and to realize upwards of $80 million of ill-gotten CDC contracts based on that stolen intellectual property.

**REDACTED**

165.    The CDC, Deloitte, and the other defendants' actions, as described above, violated federal law and regulations, including at least 41 U.S.C. §§ 1708, 2102, 3301, and 3304; and FAR §§ 3.104, 6.301-6.305, 9.500-9.508 and 15.201, and 15.203.

166.    As an agent/contractor of the CDC, AIRA was also subject to FAR in connection with the efforts undertaken in support of its contractual mandate from the CDC, and AIRA was statutorily required to agree to and to maintain confidentiality and non-use of any trade secret and confidential information disclosed by MSPP.

167.    Ms. Tate never would have allowed MSPP or any of its agents, including any MSPP licensee or MSPP's technical team, to present MSPP's trade secrets and other proprietary and/or confidential information directly to Deloitte (or that ultimately, would be shared with Deloitte) had Deloitte or the CDC accurately represented:  (i) Deloitte's substantial conflicts of interest, including its true status as MSPP's commercial rival and as the CDC's always-intended awardee of the CDC contract; and (ii) that Deloitte would use MSPP's trade secrets and other proprietary and/or confidential information to create VAMS.

168.    The U.S. Government has awarded Deloitte multiple contracts for VAMS, including a renewal contract from December 11, 2022, until December 10, 2027, resulting in Deloitte having been paid at least $80 million, and having the potential to be paid at least $138 million, for misappropriated technology.

169.    Indeed, the U.S. Government has awarded Deloitte significant federal contracts over many years.

170.    For example, in fiscal year 2023 alone, the U.S. Government awarded to Deloitte (including any parent) a total of approximately $32.7 billion in federal contracts.

**REDACTED**

171.    For fiscal year 2023, Deloitte (excluding any parent) was awarded almost $18 billion, and the previous three years totaled almost $45 billion, in U.S. Government contracts.

172.    On numerous occasions, Deloitte has protested awards of U.S. Government contracts to rivals and defended—or intervened to defend—against protests challenging its own U.S. Government contract awards, based on alleged FAR violations and conflicts of interest.

173.    Consequently, and on information and belief, Deloitte was knowledgeable about contracting and procurement law, policies, rules and regulations, guidelines and customs with the U.S. Government, including during the Secret RFP period.

### C.    **Pattern of Misappropriation**

174.    Upon information and belief, the misappropriation of trade secrets and confidential information, is not unique for agents of the CDC, Deloitte and Does/Roes.

175.    Upon information and belief, agents of the CDC, Deloitte and Does/Roes have and/or continue to carry out a similar pattern of behavior and misappropriation as they undertook with MSPP—namely:  (i) identifying an individual or relatively small company as having a unique solution that could be implemented by the CDC; (ii) presenting Deloitte as a consultant for the CDC; (iii) entering into confidentiality agreements with the individual or relatively small inventive company; (iv) inducing the disclosure of confidential information and trade secrets in view of those promises of confidentiality and non-use; (v) leading the individual or company to believe that it is going to be awarded a significant CDC or other government contract; and (vi) steering the contract(s) to Deloitte, likely through a secret RFP process, so that Deloitte provides the required good or service using the trade secrets and confidential information disclosed and taught to Deloitte by the original contender for the contract.

**REDACTED**

176. Upon information and belief, Deloitte has undertaken the aforementioned activities with government agencies in addition to the CDC.

177. Upon information and belief, Deloitte has a pattern of misappropriating trade secrets and confidential information from individuals and/or companies.

178. Upon information and belief, Deloitte has been sued by one or more third parties for trade secret misappropriation.

179. Upon information and belief, at least in a subset of those litigations resulted in settlement.

180. Upon information and belief, in one or more trade secret litigations brought against Deloitte, Deloitte lost its motion to dismiss the misappropriation claim, and settled the litigation thereafter.

181. Upon information and belief, Deloitte has a pattern, *i.e.*, it has engaged in long-term conduct, of using third-party private and public entities and their agents to improperly and unlawfully steer government contracts to Deloitte and to misappropriate confidential, proprietary and trade secret information.

182. Upon information and belief, Deloitte, either alone or in conspiracy with others, intentionally and knowingly made material misrepresentations and omissions that induced third parties to provide Deloitte with special access to their trade secrets, and Deloitte then knowingly stole and/or without authorization appropriated, took, carried away and/or by fraud, artifice, and/or deception the trade secrets with an intent to convert the trade secrets for Deloitte's economic benefit and intent and knowledge that such conversion would injure the third party, for example, to make competing products or bids and take away government contracts from the third party.

REDACTED

### D.    <u>Tolling Agreement and Its Extensions</u>

183.     With the expectation that Deloitte would incorrectly assert that May 28, 2020 (and not August 2020) was the salient date for starting the running of any misappropriation claim having a three (3) year statute of limitation, MSPP sought in 2023 to enter into a tolling agreement with Deloitte.

184.    May 28, 2023, was a Sunday.

185.    May 29, 2023, was a legal and Federal holiday, Memorial Day.

186.    May 30, 2023, was the first non-weekend, non-legal holiday after May 28, 2023.

187.    MSPP and Deloitte entered into a tolling agreement on and effective May 30, 2023 ("***Tolling Agreement***").

188.    The Tolling Agreement tolled the running of any statutes of limitation as of May 30, 2023.

189.    May 30, 2023, absent a tolling agreement, would have been the deadline for asserting a cause of action that accrued on May 28, 2023 and which had a three-year statute of limitation.

190.    MSPP and Deloitte entered into numerous extensions of the Tolling Agreement.

191.     MSPP's misappropriation claims were timely brought when alleged in its Complaint on November 25, 2024.


## V.    **COUNTS OF THE COMPLAINT**


<u>COUNT I</u>
**TRADE SECRET MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT**
(AGAINST DEFENDANTS)

192.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

**REDACTED**

193.    MSPP has a cause of action against Defendants under the DTSA, 18 U.S.C. § 1836(b), because Defendants misappropriated MSPP's trade secrets relating to its proprietary PrepMod mass vaccination management application technology, which includes products and services used in, and intended for use in, interstate commerce.

194.    MSPP's trade secrets relating to its proprietary PrepMod mass vaccination management technology include the individual trade secrets identified in this pleading, as well as the combination trade secret comprising those individual trade secrets together with the confidential information described above. *See*, *e.g.* ¶86-100.  MSPP divulged these trade secrets and confidential information pursuant to its confidentiality and nonuse agreements with the CDC, Deloitte, and other defendants.  This information concerned, for example, the architecture, formulas, designs, software, programs, workflow, data compilations, specifications, and technical methods, processes, and techniques underlying the functionality, design, and implementation of its PrepMod application and related features and services.

195.    MSPP took and has taken reasonable measures to keep such information secret, and this confidential information derived independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

196.    For example, MSPP required the CDC, Deloitte, and other defendants to agree to maintain the confidentiality and non-use and non-disclosure of MSPP's trade secrets and other confidential information before Ms. Tate disclosed them to the CDC, Deloitte, and other defendants.  By way of another example, MSPP marked its documentation containing its trade secrets that it disclosed pursuant to those agreements: "Confidential & Proprietary — Do Not Share."

**REDACTED**

197.    Additionally, MSPP limited access to its trade secrets internally, to only those who needed to have access to them for the purposes of carrying out their jobs for MSPP and/or for the purpose of administering the system for MSPP, or once PrepMod was eventually licensed, for those licensees.

198.    By way of example, MSPP protected and protects its trade secrets, including those misappropriated by Deloitte and other defendants, from unauthorized access or disclosure through use of password-protected accounts, in addition to having a security team that works to keep secure MSPP's systems and confidential and trade secret information.

199.    MSPP further required in contracts with its personnel who had access to MSPP's trade secrets—including those trade secrets misappropriated by Deloitte—that they properly protect and maintain the confidentiality of those trade secrets.

200.    Deloitte and the other defendants misappropriated MSPP's trade secrets by, for example, acquiring access to and knowledge of MSPP's trade secret information by improper means.

201.    To induce MSPP to disclose its trade secrets, Deloitte and the other defendants intentionally and knowingly misrepresented to MSPP that Deloitte was merely a government "consultant."

202.    Deloitte and the other defendants also entered into oral confidentiality and non-use agreements with MSPP with which Deloitte and the other defendants had no intention of complying and which Deloitte and the other defendants did ultimately breach.

203.    Deloitte and the other defendants also concealed from MSPP Deloitte's substantial conflicts of interest, including that Deloitte was really a commercial rival of MSPP and that Deloitte was the CDC's always-intended awardee of the CDC contract.

**REDACTED**

204.    Deloitte and the other defendants also concealed from MSPP that Deloitte was participating (or planning to participate) in the Secret RFP with the CDC.

205.    Deloitte and the other defendants also concealed from MSPP that Deloitte (or Deloitte and the other defendants) was planning to take and use MSPP's trade secret information to develop and monetize a copycat version (VAMS) for Deloitte's (or their) economic benefit and to the detriment of MSPP.

206.    The CDC, Deloitte, and the other defendants' actions, as described above, violated federal law and regulations, including at least 41 U.S.C. §§ 1708, 2102, 3301, and 3304; and FAR §§ 3.104, 6.301-6.305, 9.500-9.508 and 15.201, and 15.203.

207.    Deloitte and the other defendants also misappropriated MSPP's trade secrets by disclosing and using them without MSPP's consent, for example, by designing, producing, and monetizing a product, *i.e.*, VAMS, that improperly incorporates and/or is derived from MSPP's trade secrets.

208.    Each such disclosure and use constitutes trade secret misappropriation at least because Deloitte and the other defendants: (i) used improper means to acquire knowledge of MSPP's trade secrets (as set forth above); and (ii) at the time of disclosure and/or use, knew or had reason to know that their knowledge of MSPP's trade secrets was (I) derived from or through a person who had used improper means to acquire the trade secrets from MSPP; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of MSPP's trade secrets and/or limit the use of the trade secrets; and (III) derived from or through a person who owed a duty to MSPP to maintain the secrecy of its trade secrets and/or limit the use of the trade secrets.

**REDACTED**

209.    Upon information and belief, when Deloitte was not a direct recipient of MSPP's trade secret information from MSPP, the CDC—which also owed duties of confidentiality, non-disclosure and non-use to MSPP—disseminated MSPP's trade secret information to Deloitte.

210.    Upon information and belief, Deloitte, the other defendants and/or the CDC disseminated MSPP's trade secret information, without MSPP's consent, to the other defendants and/or Deloitte.

211.    Prior to May 11, 2020, the CDC repeatedly and consistently admitted to MSPP that the CDC did not have a workflow or any other product solution to address the mass vaccination management issues that MSPP's PrepMod technology could solve.

212.    To induce Ms. Tate to disclose, and continue to disclose, MSPP's trade secret information to them, the CDC, its agents, and Deloitte fraudulently concealed Deloitte's substantial conflicts of interest and their unlawful and improper secret scheme to award Deloitte a sole-source contract in response to a Secret RFP and to have Deloitte use MSPP's trade secret information without consent in an attempt to replicate PrepMod's design, functionalities, and implementations in a competing product.

213.    After awarding Deloitte the sole-source contract in response to the Secret RFP, the CDC and Deloitte continued to misappropriate the unlawfully obtained MSPP trade secret information and continue to do so to this day.

214.    For example, Defendants' fraudulent scheme was continued and repeatedly carried out through successive sole-source contracts between Deloitte and the CDC or the U.S. Government more generally in connection with VAMS and VAMS-related goods and services.

215.    On information and belief, one or more of the successive sole-source contracts was also procured pursuant to a secret RFP.

**REDACTED**

216.    Deloitte also intends to reap more ill-gotten gains by receiving more U.S. taxpayer-funded government contracts, for example, to move VAMS from a Salesforce architecture to AWS.

217.    As detailed herein, on information and belief, the CDC, Deloitte and the other defendants used MSPP's trade secret information in furtherance of their unlawful and improper scheme to deprive MSPP of the fruits of its labor and in an unlawful attempt to suppress competition by facilitating at least Deloitte's attempt to replicate MSPP's PrepMod technology.

218.    Had MSPP known, for example, that Deloitte was really a commercial rival of MSPP and the CDC's always-intended awardee of the CDC contract, or that Defendants were going to misappropriate MSPP's trade secret information, MSPP would not have engaged the CDC and Deloitte at the level it did, nor would it have disclosed MSPP's trade secret information to them.

219.    As addressed herein, upon information and belief, Defendants conspired to use improper means to misappropriate MSPP's trade secrets.

220.    Defendants' willful and malicious acts of misappropriation of MSPP's trade secrets, including in furtherance of their conspiracy to misappropriate MSPP's trade secrets, in violation of the DTSA, have caused irreparable harm and damaged MSPP in multiple substantial ways, including, for example, by taking, using, and monetizing MSPP's proprietary, confidential information without authorization, by publicly disclosing and diminishing the value of MSPP's trade secret information, and by causing MSPP to lose actual and potential business.

221.    MSPP is entitled to injunctive relief, monetary damages, including exemplary damages, and an award of reasonable attorney's fees, pursuant to 18 U.S.C. § 1836(b)(3).

**REDACTED**

<u>COUNT II</u>

**TRADE SECRET MISAPPROPRIATION UNDER THE MARYLAND, FLORIDA, VIRGINIA, AND/OR DISTRICT OF COLUMBIA UNIFORM TRADE SECRETS ACTS**
(AGAINST DEFENDANTS)

222.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

223.    For at least the reasons set forth above in Count I (Trade Secret Misappropriation under the DTSA) and the facts alleged therein and elsewhere in this pleading, Defendants willfully and maliciously misappropriated MSPP's trade secrets relating to its proprietary PrepMod mass vaccination management application technology and/or conspired to misappropriate such trade secrets, in violation of the Uniform Trade Secrets Act ("*UTSA*") of one or more U.S. jurisdictions, including the Maryland UTSA (Md. Code Ann. Comm. Law, Trade Regulation § 11-1201 *et seq*.); Florida UTSA (Fl. Stat. § 688.001 *et seq*.); Virginia UTSA (Va. Code § 59.1-336 *et seq*.); and/or District of Columbia UTSA (D.C. Code § 36-401 *et seq*.).

224.    Defendants' willful and malicious acts of misappropriation of MSPP's trade secrets including in furtherance of their conspiracy to misappropriate MSPP's trade secrets, in violation of the UTSA(s), have caused irreparable harm and damaged MSPP in multiple substantial ways, including, for example, by taking, using, and monetizing MSPP's proprietary, confidential information without authorization, by publicly disclosing and diminishing the value of MSPP's trade secret information, and by causing MSPP to lose actual and potential business.

225.    MSPP is entitled to injunctive relief, monetary damages, including exemplary damages, and an award of reasonable attorney's fees, pursuant to Md. Code Ann. Comm. Law, Trade Regulation §§ 11-1202–1204; Fl. Stat. § 688.003 – 5; Va. Code § 59.1-337 – 338.1; and/or D.C. Code § 36-402 – 404.

**REDACTED**

<u>COUNT III</u>
**COMMON LAW MISAPPROPRIATION OF TRADE SECRETS**
(AGAINST DEFENDANTS)

226. Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

227. For at least the reasons set forth above in Count I (Trade Secret Misappropriation under the DTSA) and Count II (Trade Secret Misappropriation under State UTSAs) and the facts alleged therein and elsewhere in this pleading, Defendants willfully and maliciously misappropriated MSPP's trade secrets relating to its proprietary PrepMod mass vaccination management application technology and/or conspired to misappropriate such trade secrets, in violation of trade secret common law at least for one or more of the States of Maryland, Virginia, Florida and the District of Columbia.

228. Defendants' willful and malicious acts of misappropriation of MSPP's trade secrets including in furtherance of their conspiracy to misappropriate MSPP's trade secrets, in violation of trade secret common law, have caused irreparable harm and damaged MSPP in multiple substantial ways, including, for example, by taking, using, and monetizing MSPP's proprietary, confidential information without authorization, by publicly disclosing and diminishing the value of MSPP's trade secret information, and by causing MSPP to lose actual and potential business.

229. MSPP is entitled to injunctive relief, monetary damages, including exemplary damages, and an award of reasonable attorney's fees.

<u>COUNT IV</u>
**COMMON LAW MISAPPROPRIATION OF CONFIDENTIAL INFORMATION**
(AGAINST DEFENDANTS)

230. Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

41

**REDACTED**

231.    Just as the CDC and Defendants took, used, and monetized MSPP's trade secret information, as alleged in Counts I-III above, Deloitte and the other defendants also misappropriated the individual pieces of confidential information (each of which in itself is not a trade secret) concerning PrepMod described above. Deloitte and the other defendants also misappropriated MSPP's confidential proposal and price quote for implementation of PrepMod as the CDC's mass vaccination management application solution.

232.    For example, prior to public access gained pursuant to PrepMod's first licensing in August of 2020, the concepts of ███████████████████████████████ ████████ as used in PrepMod, and the integration and efficiencies entailed, were all non-public, confidential information that were disclosed to the CDC and Deloitte, and provided Deloitte a significant jumpstart toward, and roadmap for the building of VAMS.

233.    One such additional then-confidential efficiency was that ███████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

234.    MSPP also confidentially disclosed to the CDC and Deloitte (and other defendants and agents of the CDC), that, aligned with and in part enabling the end-to-end system, ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ were confidential at the time of disclosure to the CDC and Deloitte (and other defendants and agents of the CDC), and for many months thereafter, and provided Deloitte a significant jumpstart in its development of VAMS.

**REDACTED**

235.    Deloitte and the other defendants engaged in this misappropriation of this confidential information in violation of one or more of the common laws of the States of Maryland, Virginia, Florida and the District of Columbia.

236.    Upon information and belief, Deloitte (including with other defendants) used MSPP's confidential information about features of PrepMod in its own VAMS product.

237.    On information and belief, Deloitte used MSPP's confidential proposal and price quote in connection with preparing and submitting Deloitte's response to the CDC's Secret RFP.

238.    Defendants willfully and maliciously misappropriated MSPP's confidential information that MSPP had disclosed to the CDC, Deloitte, and other defendants, pursuant to their agreements for confidentiality and non-use.

239.    Deloitte's (and the other defendants') misappropriation of this MSPP confidential information months in advance of it ever becoming publicly available to MSPP's licensees, enabled Deloitte to more expediently develop, and incorporate MSPP's trade secrets in, Deloitte's ultimate VAMS tool.  Deloitte's misappropriation gave it a significant advantage and a head start in the development of VAMS, as well as an advantage in obtaining the award of the CDC's contract.

240.    This resulted in significant economic harm to MSPP, including the loss of the award of the CDC's nationwide contract (as well as other, e.g., state-level contracts) as discussed above.

COUNT V
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
(AGAINST DEFENDANTS – WITHDRAWN WITHOUT PREJUDICE)

**REDACTED**

COUNT VI
**TORTIOUS INTERFERENCE**
(AGAINST DEFENDANTS)

241.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

242.    On information and belief, Deloitte and other defendants tortiously interfered with MSPP's executed contracts, business relationships, and prospective business advantage in connection with contracts for PrepMod and related goods and services.

243.    Prior to Defendants' misappropriation of MSPP's confidential, proprietary, and/or trade secret information, MSPP had an existing contract with the State of Maryland for the provision of the RC-CW Software, and in the third quarter of 2020, MSPP entered into a contract with the State of Maryland for the provision of PrepMod and related goods and services ("***Maryland PrepMod Contract***").

244.    The CDC, Deloitte and the other defendants had knowledge of MSPP's Maryland RC-CW contract because as part of MSPP's communications with the CDC and its agents regarding PrepMod in April and May 2020, MSPP disclosed the Maryland RC-CW contract to the CDC, Deloitte, and other defendants.

245.    On information and belief, prior to the State of Maryland being converted to a VAMS user, the CDC, as well as Deloitte and the other defendants also had knowledge of the Maryland PrepMod Contract.

246.    On information and belief, Deloitte and the other defendants intentionally interfered with MSPP's Maryland PrepMod Contract by willfully and maliciously misappropriating MSPP's confidential, proprietary, and/or trade secret information (as alleged herein), engaging in fraudulent and anticompetitive activity (as alleged herein), and breaching their oral agreements for confidentiality and non-use (as alleged herein) that resulted in the CDC,

**REDACTED**

Deloitte and the other defendants offering Deloitte's competing VAMS product (a product of misappropriation of MSPP's confidential information) at no cost to states. As a direct and proximate result, the State of Maryland stopped using PrepMod and switched to VAMS, citing its lack of cost to said State.

247.     Defendants' intentional interference with the Maryland PrepMod Contract damaged MSPP by causing MSPP to lose actual and potential business.

248.     On information and belief, Deloitte and other defendants also tortiously interfered with MSPP's business relationships and prospective business advantage with other states and governmental entities in connection with PrepMod.

249.     As alleged herein, Defendants willfully and maliciously engaged in, among other things, misappropriation of MSPP's confidential, proprietary, and/or trade secret information relating to PrepMod, MSPP's unique and proprietary mass vaccination management solution that the CDC desperately needed for the COVID pandemic; fraudulent and anticompetitive activity; and breaches of contract. Defendants' actions were calculated to cause, and performed for the unlawful purpose of causing, damage and loss to MSPP in its lawful business related to its proprietary PrepMod technology.

250.     Defendants' willful and malicious acts damaged MSPP and caused it to suffer losses.

251.     On information and belief, but-for Defendants' willful and malicious acts, MSPP would have been awarded the contract that the CDC awarded instead to Deloitte in the amount of $15,891,816.74 and that was followed by successive related contracts, including sole-source, with Deloitte which all together, resulted to date in payments to Deloitte exceeding at least $80 million,

---

**REDACTED**

with Deloitte having the potential to receive in total more than $138 million from the CDC. (Source: www.usaspending.gov)

252.    But-for Defendants' willful and malicious acts that led to the CDC's adoption of Deloitte's unlawfully-made VAMS product, all of the U.S. jurisdictions that ultimately used Deloitte's VAMS product—*i.e.*, the very product of Defendants' misappropriation of MSPP's confidential, proprietary, and/or trade secret information—would have used PrepMod instead.

253.    For example, MSPP lost out at least on an approximately $1.2 million contract for PrepMod and related goods and services with the State of Florida, which would have awarded the contract to MSPP but-for Defendants' willful and malicious acts that led to the CDC awarding Deloitte the sole-source contract to produce VAMS.  Instead of PrepMod, the State of Florida opted to use Deloitte's VAMS.

## COUNT VII
### UNFAIR COMPETITION
(AGAINST DEFENDANTS)

254.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

255.    Deloitte and other defendants engaged in deceptive and wrongful business practices, including misappropriation, fraud, deceit, trickery, and other unfair methods that damaged MSPP and jeopardized its business relating to its proprietary PrepMod mass vaccination management application.

256.    MSPP invested substantial time and resources in creating, developing and commercializing its proprietary PrepMod product and related goods and services.

257.    As alleged herein, the CDC, Deloitte and other defendants misrepresented to MSPP Deloitte's role as a government consultant and concealed from MSPP Deloitte's substantial

**REDACTED**

conflicts of interest, including Deloitte's true role as a commercial rival of MSPP and as the CDC's always-intended awardee of the CDC contract, and fraudulently entered into agreements of confidentiality and non-use with MSPP to induce MSPP to disclose its confidential, proprietary, and/or trade secret information relating to PrepMod to them.  In reasonable reliance on those representations and agreements, and without knowledge of the highly material concealed information, MSPP disclosed its confidential, proprietary, and/or trade secret information relating to PrepMod to them.

258.    The CDC's, Deloitte's, and the other defendants' actions, as described above, violated federal law and regulations, including at least 41 U.S.C. §§ 1708, 2102, 3301, and 3304; and FAR §§ 3.104, 6.301-6.305, 9.500-9.508 and 15.201, and 15.203.

259.    As alleged herein, Deloitte and other defendants willfully and maliciously misappropriated MSPP's confidential, proprietary, and/or trade secret information relating to PrepMod by taking, using, and monetizing MSPP's confidentially disclosed information in participating in CDC's Secret RFP, getting awarded the eight-figure sole-source contract (and successive related contracts) with CDC, and producing a copycat version of PrepMod (*i.e.*, VAMS) that would directly compete against MSPP's PrepMod.  Whereas MSPP charged fees for PrepMod, CDC made the competing VAMS product available at no cost to states.

260.    Defendants' deceptive and wrongful business practices have damaged or jeopardized MSPP's business, caused MSPP significant economic loss and harm, including but not limited to MSPP's (i) not being awarded contracts with the CDC/US Government which paid Deloitte at least $80 million with total potential of paying Deloitte more than $138 million (Source: www.usaspending.gov), instead of paying those monies to MSPP; (ii) loss of contracts and prospective contracts to provide PrepMod and goods and services related thereto to third parties,

**REDACTED**

and loss of the remuneration and other benefits that were being or would have been conferred to MSPP thereunder; (iii) other loss of market share, reputation as the primary provider of vaccine-tracking solutions, and other renown and goodwill in MSPP's business; and (iv) the diminished value of what had prior to the CDC's and Defendants' breaches of their agreements with MSPP, been MSPP's highly valuable confidential and/or trade secret information.

## COUNT VIII
### FRAUD
(AGAINST DEFENDANTS)

261.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

262.    During and in connection with MSPP's meetings with the CDC to discuss MSPP's proprietary, confidential and/or trade secret information concerning its PrepMod solution for the CDC's needs, Deloitte and CDC (and the other defendants) misrepresented Deloitte's role to MSPP and concealed from MSPP Deloitte's substantial conflicts of interest, including Deloitte's true role as a commercial rival of MSPP and as the CDC's always-intended awardee of the CDC contract.

263.    Deloitte and the CDC (its agents and employees) hid from MSPP (i) Deloitte's substantial conflicts of interest, including that Deloitte was not merely the CDC's "consultant" but actually was a commercial rival of MSPP and the CDC's always-intended awardee of the CDC contract; and (ii) that the CDC positioned Deloitte to, and Deloitte's aim was to, learn and misappropriate MSPP's proprietary, confidential and/or trade secret information, to use in Deloitte's creation of VAMS for the CDC pursuant to that contract.

**REDACTED**

264.    The CDC's, Deloitte's, and the other defendants' actions, as described above, violated federal law and regulations, including at least 41 U.S.C. §§ 1708, 2102, 3301, and 3304; and FAR §§ 3.104, 6.301-6.305, 9.500-9.508 and 15.201, and 15.203.

265.    On information and belief, Deloitte and the CDC (and the other defendants) knew their representations about Deloitte's role to be false and their omissions about Deloitte's true status as a commercial rival and the intended contract awardee to be misleading, or, alternatively, Deloitte and/or the CDC engaged in such conduct with such reckless disregard to the truth as to be equivalent to actual knowledge of falsity.

266.    On information and belief, Deloitte and the CDC (and the other defendants) made these material misrepresentations and omissions for the purpose of defrauding MSPP and obtaining special access to MSPP's proprietary, confidential and/or trade secret information.

267.    MSPP reasonably relied on Deloitte's and the CDC's (and the other defendants) material misrepresentations and omissions, including their agreement to maintain confidentiality and nonuse of MSPP's disclosed intellectual property.

268.    Indeed, the CDC and Deloitte (and the other defendants) also sought to induce MSPP to provide PrepMod, as well as additional information about PrepMod, via a sandbox.

269.    In doing so, the CDC and Deloitte (and the other defendants) falsely conveyed to MSPP that they respected the highly confidential and/or trade secret nature of MSPP's intellectual property, and that they were maintaining it as confidential and not using it—when none of that was really true.

270.    Deloitte's and the CDC's (and the other defendants') material misrepresentations and omissions, including their agreements with MSPP to maintain confidentiality and nonuse of her intellectual property, induced MSPP to detrimentally rely on those representations and disclose

**REDACTED**

its proprietary, confidential and/or trade secret information to Deloitte and the CDC.  Had MSPP known that Deloitte was in actuality a commercial rival of MSPP and the CDC's always-intended awardee of the CDC contract, or that Deloitte was going to misappropriate MSPP's intellectual property, MSPP would not have disclosed MSPP's proprietary, confidential and/or trade secret information to them, nor otherwise engaged with them at the level it did.

271.    Such material misrepresentations and omissions, and Deloitte's ensuing misappropriation of MSPP's intellectual property, have caused irreparable harm and damaged MSPP in multiple substantial ways, including, for example, by publicly disclosing and diminishing the value of MSPP's proprietary, confidential and/or trade secret information, and by causing MSPP to lose actual and potential business.

COUNT IX
**CIVIL CONSPIRACY**
(AGAINST DEFENDANTS)

272.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

273.    On information and belief, employees and/or agents of the CDC, Deloitte and other defendants engaged in a civil conspiracy to commit fraud and other unlawful acts described herein, on MSPP and, in part, unlawfully obtain, steal, copy, disclose, misappropriate and use MSPP's proprietary, confidential and/or trade secret information.

274.    On information and belief, the CDC and Defendants agreed to enter into and then breach their confidentiality and non-use agreements with MSPP.

275.    On information and belief, the CDC and Defendants agreed to induce—including through misrepresentations and omissions—MSPP to enter into said confidentiality and non-use agreements with them under which MSPP would disclose its proprietary, confidential and/or trade

50

**REDACTED**

secret information comprising, concerning, referring and/or relating to PrepMod and its proposal and estimates/bid for providing PrepMod as a solution to the CDC's needs.  The CDC and Defendants did so with the intent of breaching those agreements (which they indeed did as described herein) and using, publicly disclosing, and/or monetizing MSPP's proprietary, confidential and/or trade secret information, and information derived therefrom.

276.    On information and belief, the CDC and Deloitte and/or other defendants further agreed and intended to interfere with MSPP's contracts and prospective contracts (and indeed at least Deloitte did, as described herein) to provide PrepMod and goods and services related thereto, with the goal of Deloitte providing VAMS to the CDC, the U.S. Government more generally, and to MSPP's customers and prospective customers, and thus effectively removing MSPP as the primary provider, otherwise as a competitor, and/or otherwise minimizing MSPP's renown and market share for PrepMod.

277.    On information and belief, the CDC and Deloitte and/or other defendants agreed together to, and undertook a concerted effort to, unlawfully obtain, steal, copy, disclose, misappropriate and use MSPP's proprietary, confidential and/or trade secret information so as to (i) allow at least Deloitte to obtain the Award and receive all monetary and other benefits conferred to it under that and subsequent VAMS-related contracts; (ii) allow at least Deloitte to use the confidential and/or trade secret information misappropriated from MSPP to create VAMS, VAMS-related goods and services, and/or other goods and services; and/or (iii) to allow Deloitte to stymie and supplant the use and sale of MSPP's PrepMod, and take over MSPP's market share, and attempt to remove MSPP as the primary (and then alternative) vaccine-tracking solution provider.

278.    The carrying out of the foregoing agreements between and among the CDC, Deloitte and other defendants caused significant economic loss and harm to MSPP, including

**REDACTED**

MSPP's: (i) not being awarded contracts with the CDC/US Government which paid Deloitte at least $80 million with total potential of paying Deloitte more than $138 million (Source: www.usaspending.gov), instead of paying those monies to MSPP; (ii) loss of contracts and prospective contracts to provide PrepMod and goods and services related thereto to third parties, and loss of the remuneration and other benefits that were being or would have been conferred to MSPP thereunder; (iii) other loss of market share, reputation as the primary provider of vaccine-tracking solutions, and other renown and goodwill in MSPP's business; and (iv) the diminished value of what had prior to the CDC's and Defendants' breaches of their agreements with MSPP, been MSPP's highly valuable confidential and/or trade secret information.

279.    At least Deloitte's use and monetization of MSPP's confidential and/or trade secret information continues today, without remuneration, and instead with continuing harm to MSPP.

280.    On information and belief, employees or agents of CDC, Deloitte and other defendants agreed to engage in a secret RFP process for the vaccine-tracker application, and to exclude MSPP from that RFP.

281.    Engagement in this Secret RFP process was in violation of at least 41 U.S.C. §§ 3301 and 3304, and FAR §§ 6.301-6.305, 15.201, and 15.203.

282.    On information and belief, absent the CDC and Defendants' (i) agreement to enter into NDA and non-use agreements with MSPP to procure MSPP's proprietary confidential and/or trade secret information concerning PrepMod and MSPP's proposal and bid, and then breach that agreement (which they did) as described herein, and (ii) agreement to engage in (and their actual carrying out of a) secret RFP process, the CDC's and/or the U.S. Government contracts for the vaccine-tracker application would have been awarded to MSPP.

**REDACTED**

283.    As described herein, on information and belief, Deloitte had not developed its own mass vaccination management application at the time of the confidential disclosures MSPP made to the CDC, Deloitte and defendants pursuant to their confidentiality and non-use agreements.

284.    On information and belief, Deloitte had not developed its own vaccination management application at the time of the Award of the contract to Deloitte.

285.    As described herein, MSPP, at the time of its sharing its confidential and/or trade secret information with CDC, Deloitte and the other defendants, already had in-hand its fully-functional, immediately-available mass vaccination management application (PrepMod).

286.    But for the aforementioned unlawful acts, including breaches and misappropriations, on information and belief, Deloitte could not have created the VAMS that it ultimately provided to the CDC, U.S. Government more broadly, and other third parties.

287.    Had the aforementioned agreements to commit wrongs and further unlawful acts not occurred, MSPP's contract to provide PrepMod and related goods and services, would have persisted, and on information and belief, MSPP would have executed additional contracts to provide PrepMod and related goods and services to third parties (e.g., the contracts and prospective contracts that Deloitte tortiously interfered with and that the CDC and Defendants enable Deloitte to interfere with) would have persisted and/or come to fruition.

288.    Instead, the CDC and Defendants' (and other defendants') aforementioned agreements to commit wrongs, and further aforementioned unlawful acts in advance of those agreements, caused and continue to cause substantial economic harm to MSPP.

///

///

///

**REDACTED**

COUNT X
**UNJUST ENRICHMENT**
(AGAINST DEFENDANTS)

289.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

290.    MSPP conferred a benefit onto at least Deloitte (and the other defendants) when MSPP disclosed to Deloitte and CDC (or to Deloitte through the CDC) and the other defendants MSPP's proprietary, confidential and/or trade secret information.

291.    In the alternative, MSPP conferred a benefit onto at least Deloitte when Deloitte improperly obtained or had access to MSPP's proprietary, confidential and/or trade secret information.

292.    Deloitte (and the other defendants) improperly benefitted from the wrongful use of MSPP's proprietary, confidential and/or trade secret information, including in connection with learning of MSPP's bid amount and other confidential information, and using that information in making its own bid and proposal, to obtain the award of the CDC's contracts, and deprive MSPP from being awarded the contracts.

293.    Deloitte (and the other defendants) further improperly benefitted from the wrongful use of MSPP's proprietary, confidential and/or trade secret information, including by using that information in its creation of VAMS, without MSPP's permission and without any remuneration to MSPP.

294.    Deloitte was thus unjustly enriched through its award of contracts from the U.S. Government totaling, in information and belief, at least approximately $80 million dollars in payments to Deloitte, to date, with the total amount of payments to Deloitte under these contracts potentially to exceed $138 million.  (Source: www.usaspending.gov)

**REDACTED**

295.    On information and belief, Deloitte (and the other defendants) benefitted at, *inter alia*, MSPP's expense since MSPP did not get paid at least approximately $80 million by the U.S. Government, with the potential to receive in total at least about $138 million.

296.    Deloitte further benefitted from misappropriating MSPP's proprietary, confidential and/or trade secret information by avoiding costs, time and other resources, that it otherwise would have had to invest to develop its own technological solution in the absence of having breached its agreement with and misappropriating from MSPP.

297.    Deloitte (and the other defendants) further benefitted from interfering with MSPP's actual and prospective contracts with third parties for provision of PrepMod and any Prep-Mod-related goods and services, resulting in those third parties cancelling or foregoing contracts with MSPP to contract with Deloitte for its VAMS or VAMS-related goods and services instead.

298.    It would be unjust and inequitable to allow at least Deloitte (and the other defendants) to retain and exploit MSPP's proprietary, confidential and/or trade secret information, including through but not limited to, VAMS.

299.    Similarly, it would be unjust and inequitable to allow Deloitte (and defendants) to retain the monetary remuneration and any other benefits conferred to it under the contracts with the CDC, the U.S. Government more broadly, or any other person or entity, in connection with VAMS and any other VAMS-related good or service, or other good or service using or derived from MSPP's proprietary confidential and/or trade secret information.

300.    To the extent not reflected above, it would be unjust and inequitable to allow Deloitte (or any defendant) to retain any monetary remuneration or other benefit conferred on it as a result of its tortious interference with MSPP's contracts and prospective contracts, and as a result of its other bad acts, all of the foregoing having prevented MSPP from being awarded contracts,

**REDACTED**

and from maintaining contracts with the CDC, the U.S. Government more broadly, and/or other third parties, precluding remuneration and other benefits being conferred on MSPP, and further having diminished the value of MSPP's proprietary, confidential and/or trade secret information by using and disclosing it publicly without authorization from or compensation to MSPP.

301.    As a direct and proximate result of at least Deloitte's (and the other defendants') unjust enrichment, MSPP has suffered and continues to suffer substantial damages.

<u>COUNT XI</u>
**BREACH OF CONTRACTS**
(AGAINST DEFENDANTS)

302.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

303.    In April 2020, CDC and/or its agents contacted Ms. Tate requesting that she provide a live demonstration of PrepMod and other MSPP information.

304.    Thereafter, at CDC's request, Ms. Tate participated in multiple meetings with staff and/or agents of CDC and others associated with CDC, including Deloitte (and the other defendants), at which she presented MSPP proprietary, confidential and/or trade secret information regarding PrepMod.  Such meetings include, for example, the meetings on April 21, 2020, April 27, 2020, May 5, 2020, and May 6, 2020, as set forth in the allegations above.

305.    At all times relevant, before Ms. Tate presented MSPP's trade secret, proprietary and/or confidential information, including PrepMod, she emphasized that she was presenting MSPP's proprietary and confidential information and that it was to be maintained as confidential and not used other than for the purpose of evaluating MSPP's proprietary technology for fulfilling the CDC's need.

**REDACTED**

306.    During these meetings, it was agreed and understood, either expressly or impliedly, by those present, including Deloitte, and other defendants, that as a condition to being given access to MSPP's  trade secrets and other confidential information, the recipients would maintain the confidentiality of MSPP's confidential disclosures and would not use MSPP's trade secret and other confidential and proprietary information for any other purpose than evaluating MSPP as the potential provider for the CDC's needs.

307.    Each such agreement was a valid and enforceable oral contract between MSPP and each of the recipients (including from Deloitte) of MSPP's confidential disclosures.

308.    As an existing consultant and contractor to the CDC, Deloitte was expressly required by federal regulation to agree to protect any MSPP proprietary information to which Deloitte received access from unauthorized use or disclosure and to refrain from using MSPP's information for any purpose other than that for which MSPP furnished it.  FAR § 9.505-4(b); FAR § 9.508(h).

309.    Similarly, the CDC was obligated by federal regulation to require Deloitte to enter into confidentiality and nonuse agreements with MSPP and to ensure Deloitte's compliance.  FAR § 9.505-4(b); FAR § 9.508(h).

310.    Deloitte and the other defendants breached, and continue to breach, the agreements by wrongfully using MSPP's trade secret and other confidential and proprietary information regarding PrepMod that Deloitte and the other defendants obtained, either directly or indirectly from MSPP.

311.    Deloitte, for example, obtained MSPP's trade secret and other confidential and proprietary information through employees and/or agents of the CDC, who were also obligated and agreed to maintain its confidentiality and restricted use.

**REDACTED**

312.    In breach of its agreements with MSPP, Deloitte used this MSPP-confidential information as well as MSPP's confidential information that it directly obtained from MSPP  to procure the award of the sole-source contract from the CDC, and pursuant to that contract, further used MSPP's confidential information to create VAMS.

313.    In engaging in such activity, Deloitte knowingly and intentionally violated its obligations to maintain the confidentiality of MSPP's trade secret and other confidential information and not to use or disclose MSPP's information.  Instead, Deloitte exploited MSPP's proprietary technological innovations and goodwill and passed them off as if they were its own.

314.    Defendants' breach has caused irreparable harm and damaged MSPP in multiple substantial ways, including, for example, by taking, using, and monetizing MSPP's trade secrets and other confidential intellectual property without authorization, by publicly disclosing and diminishing the value of MSPP's trade secret and other confidential information, and by causing MSPP to lose actual and potential business.

<u>COUNT XII</u>
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
(AGAINST DELOITTE)

315.    Plaintiff incorporates by reference all allegations contained in all of the foregoing paragraphs as if fully stated herein.

316.    Deloitte has monopolized, or attempt to monopolize, or combined or conspired with other person or persons, to monopolize a part of interstate trade or commerce, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  MSPP has a cause of action against Deloitte pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, because MSPP has been injured in its business and/or property by reason of Deloitte's violation of 15 U.S.C. § 2.

**REDACTED**

317.    Deloitte has violated and continues to violate the Sherman Act, 15 U.S.C. § 2, by engaging in anticompetitive conduct with a specific intent to procure and maintain a monopoly in the market for a national, federally-adopted mass vaccination application for registering, administering, and reporting COVID vaccinations, and was or is maintaining and enhancing its monopoly as a result of its exclusionary, anticompetitive conduct.

318.    For example, Deloitte's monopoly in this market was recognized in a November 26, 2024 article: "In total, 25 states have awarded Deloitte eligibility system contracts, making the company the dominant player in this crucial slice of government business.  These agreements, in which Deloitte commits to design, develop, or operate state-owned systems, are worth at least $6 billion, according to a KFF Health News analysis of state contracts."[4]

319.    In the early months of the COVID pandemic in 2020, the CDC was preparing for the anticipated eventual nationwide rollout of a COVID vaccine, but did not have or know of any tool that could schedule, track, and report large-scale vaccinations on the scale that was anticipated for COVID.

320.    In April 2020, AIRA, a third party that the CDC commissioned as an agent to survey mass vaccination response capabilities and considerations, identified MSPP as having a mass vaccination module and contacted Ms. Tate to request a demonstration and discussion of MSPP's proprietary RC-CW technology.

321.    On April 21, 2020, Ms. Tate provided a live demonstration of the RC-CW Software to a small group of AIRA representatives and identified and discussed a subset of additional features provided in PrepMod.  Prior to presenting, Ms. Tate advised that the forthcoming

---

[4]   D. Cheng & S. Liss, *Florida's Deloitte-Run Computer System Cut Off New Moms Entitled to Medicaid*, KFF Health News (Nov. 26, 2024), https://kffhealthnews.org/news/article/florida-deloitte-medicaid-computer-system-women-pregnancy-disenroll/, last visited Jan. 17, 2025.

**REDACTED**

information was proprietary and confidential to MSPP, and prior to her presenting it, the attendees of the meeting agreed to maintain the information as confidential.

322.    On information and belief, before April 27, 2020, Deloitte obtained access to the substance of said April 21, 2020 confidential meeting.

323.    On or after April 25, 2020, AIRA, in its CDC-commissioned report entitled "Mass Vaccination Quick Survey of IIS Community," concluded that MSPP had the *only* functioning and fully-developed bi-directional mass vaccination application commercially available to address mass vaccination.  This application was the RC-CW Software.

324.    Also in this same report, AIRA noted other available or in-process modules or applications that were used on strictly local levels, were uni-directional, and/or which would require significant augmentation and modification to be used even for limited purposes, on a larger, i.e. nationwide, scale.  AIRA's assessment and recognition of the limitations of these other efforts in or attempting to enter the marketplace, was based on 50 responses to its inquiries, representing 49 jurisdictions across the United States and its territories.

325.    On April 27, 2020, Ms. Tate attended a Zoom meeting with Gibbs-Scharf, other CDC staff, and employees and/or agents of Deloitte, who, according to Gibbs-Scharf, were "consultants" for CDC.  Unbeknownst to MSPP at the time, Deloitte's true role was as a commercial rival to MSPP and the CDC's always-intended awardee of the CDC contract.  CDC and Deloitte had knowledge of, but concealed from MSPP, these substantial conflicts of interest.

326.    Again with the attendees' agreements to maintain the confidentiality and non-use of MSPP's trade secret and other proprietary and confidential information, Ms. Tate gave a slide presentation on PrepMod (marked "CONFIDENTIAL & PROPRIETARY—DO NOT SHARE"), along with a live demonstration of PrepMod and discussion of process workflow and other

**REDACTED**

technical details, all of which contained proprietary, confidential and/or trade secret information owned by MSPP. During the meeting, the CDC admitted to MSPP that the CDC had no existing or conceived system, plan, or workflow—or knowledge of any—to address the mass vaccination problem.

327. The CDC was excited about PrepMod and the next day, April 28, 2020, upon information and belief, with Deloitte's knowledge, requested a follow-up meeting with MSPP's technical team and further requested a "sandbox or at least screenshots" of PrepMod, and memorialized a previous verbal inquiry about the cost of PrepMod.

328. On April 28, 2020, Ms. Tate sent a "Confidential" message to the CDC detailing, among other things, the pricing, scope of work, and partnerships for nationwide implementation and use of PrepMod. Upon information and belief, the CDC shared at least MSPP's confidential proposal and bid information with Deloitte.

329. On May 1, 2020, Gibbs-Scharf emailed a meeting request to an individual on MSPP's technical team "to discuss technical specs for PrepMod and related modules." On May 4, 2020, Ms. Tate sent to the CDC the slides she had presented on April 27, 2020, augmented with numerous screenshots of PrepMod with detailed explanations, all marked as "CONFIDENTIAL & PROPRIETARY—DO NOT SHARE." Upon information and belief, the CDC shared this confidential and proprietary information with Deloitte.

330. On May 5, 2020, the CDC met with MSPP (Ms. Tate and its technical team). At the meeting, the CDC asked MSPP about the architecture, technical approach and coding language concerning PrepMod, and MSPP fully answered the CDC's questions, provided further-detailed and technical specifications of PrepMod, and charted and delineated to the CDC concrete plans for expeditious scaling and a national roll-out that involved existing partnerships with AIM, and

**REDACTED**

the national software firm, Fearless, which had extensive experience with, *inter alia*, government agencies, including contracts with the CDC working on, *inter alia*, immunization-related and data repository items.  Upon information and belief, the CDC shared this confidential and proprietary information with Deloitte.

331.    During and after the May 5th Meeting, the CDC never asked any follow-up questions about the concrete plans MSPP presented and did not question or challenge in any way MSPP's individual ability or MSPP's planned partnership's ability to handle a national rollout.

332.    Prior to and during the May 5th Meeting, Ms. Tate asked the CDC if it had any plans for handling public registration and vaccine reporting for COVID vaccinations, and the CDC specifically represented <u>again</u> that it did <u>not</u> have a plan, system or <u>any</u> workflow in place, or knowledge of any.

333.    On May 6, 2020, Ms. Tate presented to the CDC even further details of PrepMod's technical infrastructure pursuant to their agreements of confidentiality and non-use.  Upon information and belief, the CDC shared this confidential and proprietary information with Deloitte.

334.    On May 11, 2020, less than one week after representing that it had no plan, no system, no workflow, and no knowledge of any of the foregoing, the CDC announced during a meeting that it had a "draft" workflow and announced its intention to build a "mass vaccination app."  During the meeting, the CDC presented a draft workflow of its mass vaccination app.

335.    From at least May 11, 2020, until on or around May 27, 2020, the CDC publicly was stating in various forums that: (i) it was going to be providing a mass vaccination app; (ii) a "vendor" already had been identified, and (iii) the CDC would release said vendor's name "soon."

336.    Ms. Tate reasonably concluded from, *inter alia*, the CDC's comments that the CDC intended to engage MSPP in using PrepMod, particularly given the number and depth of the

**REDACTED**

discussions and interactions about PrepMod between CDC and MSPP that occurred.  Certain CDC staff conveyed to Ms. Tate the same belief that MSPP would be awarded the contract.

337.    From at least May 11, 2020, until on or around May 27, 2020, when discussing the CDC's planned vaccination app and impending announcement of the vendor that the CDC had selected, it never disclosed to MSPP or otherwise publicly disclosed that the CDC had opened a so-called competitive bid process or that one was even contemplated.

338.    On May 14, 2020, Gibbs-Scharf executed a non-public J&A identifying Deloitte as the only contractor that could complete within two (2) months a "robust" vaccine administration tracking application for nationwide use after providing supposed justification that Deloitte had a proprietary Salesforce CRM platform that purportedly made Deloitte "uniquely qualified to support vaccine tracking."

339.    On May 27, 2020, the CDC privately awarded Deloitte, the sole submitter through the Secret RFP, a one-year contract for $15,891,816.74 in connection with creating and providing a mass vaccination management application.  The amount of Deloitte's winning bid was close to, but about $0.6 million greater than, MSPP's proposed price of about $15.2 million that it had confidentially quoted the CDC to license PrepMod.

340.    On information and belief, Deloitte had knowledge of MSPP's confidential price quote to the CDC and used that information in preparing its own bid, which was the only bid to the CDC, pursuant to the Secret RFP.  On May 28, 2020, CDC publicly disclosed Award ID 75D30120C08239, said private award to sole-bidder Deloitte.  When VAMS ultimately launched in late 2020, CDC made VAMS available to all states at no charge.

**REDACTED**

341.    The CDC's, Deloitte's, and the other defendants' actions, as described above, violated federal law and regulations, including at least 41 U.S.C. §§ 1708, 2102, 3301, and 3304; and FAR §§ 3.104, 6.301-6.305, 9.500-9.508 and 15.201, and 15.203.

342.    Since then, the U.S. Government has awarded Deloitte multiple additional sole-source contracts for VAMS, including a renewal contract from December 11, 2022, until December 10, 2027, resulting in Deloitte having been paid at least $80 million dollars for a product of Deloitte's misappropriation from MSPP, with the potential to receive in total at least about $138 million from the U.S. Government in connection therewith.

343.    Deloitte receives billions of dollars in annual revenues from contracts with the U.S. Government.  In fiscal year 2023 alone, the U.S. Government awarded to Deloitte (including any parent) a total of approximately $32.7 billion in federal contracts.  For fiscal year 2023, Deloitte (excluding any parent) was awarded almost $18 billion, and the previous three years totaled almost $45 billion, in U.S. Government contracts.  At all times relevant, Deloitte was knowledgeable about contracting and procurement law, policies, rules and regulations, guidelines and customs with the U.S. Government.

344.    Deloitte knowingly and intentionally participated in the Secret RFP, and fraudulently obtained access to MSPP's confidential, proprietary, and/or trade secret information with the intent to misappropriate it and indeed, did misappropriate it by, for example, breaching its agreement of confidentiality and non-use with MSPP and using, disclosing, and monetizing MSPP's confidential, proprietary, and/or trade secret information in producing VAMS and procuring contracts with the CDC or the U.S. Government more generally.

345.    While "MSPP had the *only* functioning and fully-developed bi-directional mass vaccination application commercially available to address mass vaccination," as AIRA

**REDACTED**

recognized, and the CDC was elated to learn not just of Readi-Consent and ClinicWizard, but of the unparalleled pandemic-preparedness SaaS-tool PrepMod, other third parties had self-developed or were developing vaccination-related modules or tools for facets of pandemic-related needs.

346.    On information and belief, had these third parties been aware that the CDC was looking for a more robust and comprehensive vaccine administration solution, they could have been working toward that goal much earlier, for example in response to a public—instead of a secret—RFP.

347.    On information and belief, Deloitte's award of the CDC contract and effective installment by the CDC as the dominant player in this critical industry automatically displaced MSPP and these other competitors and potential competitors from having a more significant market share or any market share at all.

348.    On information and belief, Deloitte's anti-competitive conduct did not just exclude MSPP—third-party software companies that were positioned similarly to Deloitte (*i.e.*, companies that, like Deloitte, did not already have a functioning and fully-developed bi-directional mass vaccination application) could have vied for the CDC's contracts, but for Deloitte's anticompetitive conduct, including in cooperation with the CDC.

349.    On information and belief, through its anticompetitive scheme, only Deloitte was privy to the CDC's Secret RFP, and only Deloitte–armed with knowledge of MSPP's proprietary, confidential and/or trade secret information–was able to bid on the Secret RFP and win the CDC's contract and ultimately fulfill it with what would become VAMS.

**REDACTED**

350.    On information and belief, Deloitte and the CDC worked together to avail Deloitte of MSPP's trade secret and confidential information so that Deloitte would then use that information to fulfill the CDC's needs as the always-intended awardee of the CDC's contract.

351.    In violation of 15 U.S.C. § 2, Deloitte knowingly and intentionally engaged in, and continues to engage in, an anti-competitive scheme to exclude potential commercial rivals, remove MSPP as the principal provider of a fully-functioning mass-vaccination management application, interfere with MSPP's contracts for PrepMod and procure MSPP's customers and potential customers, and offer VAMS at no cost to states in order to diminish MSPP's market share and monopolize the market for a national, federally adopted mass vaccination management application.

352.    Deloitte has combined with the CDC and/or other defendants, as set forth herein, and additionally has conspired with the CDC and/or other defendants, as set forth above and in Count IX (Civil Conspiracy), to attempt to monopolize and ultimately monopolize the national market for mass vaccination applications for registering, administering, and reporting COVID vaccinations.  This anticompetitive scheme was continued and repeatedly carried out through successive sole-source contracts between Deloitte and the CDC or the U.S. Government more generally in connection with VAMS and VAMS-related goods and services.

353.    On information and belief, one or more of the successive sole-source contracts was also procured pursuant to a secret RFP.

354.    Deloitte's violations of 15 U.S.C. § 2 have caused irreparable harm and damaged MSPP in multiple substantial ways, including, for example, by taking, using, and monetizing MSPP's proprietary, confidential information without authorization, by publicly disclosing and diminishing the value of MSPP's proprietary, confidential and/or trade secret information, and by causing MSPP to lose actual and potential business.

**REDACTED**

## VI.    REQUESTED RELIEF

WHEREFORE, Plaintiff, MSPP, respectfully requests that this Court enter judgment, *inter alia*:

A.    Awarding to MSPP and against at least Deloitte, and at the appropriate time, all Defendants, jointly and severally:

1.    Damages in an amount in excess of $80,000,000 to be proved at trial;

2.    Damages on account of defendants' unjust enrichment resulting from defendants' misappropriation, breach, and other bad acts;

3.    Damages resulting from defendants' tortious interference with MSPP's contracts and prospective contracts;

4.    Exemplary/punitive damages and treble damages, including for willful and malicious conduct, and as permitted for other causes of action;

5.    Attorneys' fees, costs and expenses;

6.    Pre- and post-judgment interest; and

7.    Damages resulting from Defendants' violation of 15 U.S.C. § 2, in at least the amounts authorized by 15 U.S.C. § 15, *i.e.*, threefold the damages sustained by MSPP, and the cost of suit, including reasonable attorneys' fees, and simple interest on actual damages for the period beginning on the date of service of MSPP's Complaint setting forth a claim under the antitrust laws and ending on the date of judgment.

B.    Providing for a constructive trust.

C.    Enjoining and restraining, temporarily, preliminarily and permanently, as follows (and as appropriate):

---

**REDACTED**

        1.      Enjoining at least Deloitte, as well as its agents, affiliates, successors, assigns, representatives, and attorneys and all others acting by, with, for or through, or under authority of at least Deloitte, and all other defendants, from using, disclosing, transferring, or possessing, in whole or in part, MSPP's proprietary, confidential and/or trade secret information;

        2.      Enjoining at least Deloitte, as well as its agents, affiliates, successors, assigns, representatives, and attorneys and all others acting by, with, for or through, or under authority of at least Deloitte, and all other defendants, from using, disclosing, transferring, or possessing, in whole or in part, any information or data, including VAMS, created by relying upon or otherwise derived from MSPP's proprietary, confidential and/or trade secret information;

        3.      Directing any enjoined defendant to return to MSPP or otherwise destroy all of MSPP's proprietary, confidential and/or trade secret information, and anything derived therefrom, in any defendant's possession, custody, or control;

        4.      Directing any enjoined defendant to provide MSPP with access to any enjoined defendant's computers, networks, servers, e-mail accounts, phones, and other data storage devices and spaces, for purposes of allowing a forensic consultant of MSPP's choosing to confirm compliance with the foregoing directives; and

        5.      Directing any enjoined defendant to certify under oath that it/they have fully complied with the foregoing directives.

        D.      Awarding such further relief as this Court deems equitable and just.

## VII.   JURY DEMAND

        MSPP demands a jury trial on all issues so triable.

**REDACTED**

Respectfully submitted,

NEWMAN LAW OFFICES

By:  ___/s Howard A. Newman/___
Howard A. Newman, Esq.
*Admitted Pro Hac Vice*
1717 K Street, NW; Suite 900
Washington, DC  20006
(202) 544-8040
F:  (866) 544-8040
howard@newmanlawoffices.com

*Counsel for Plaintiff, Multi-State Partnership for Prevention, LLC*

Dated:  May 19, 2025.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this  __**19th**__ day of May, 2025, a true and correct copy of the foregoing has been furnished by CM/ECF, to all parties of record, which include, Defendant's counsel:

SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

**Robert S. Friedman, Esq.**
rfriedman@sheppardmullin.com
**Joshua Schlenger, Esq.**
jschlenger@sheppardmullin.com
**Sylvia Waghorne, Esq.**
swaghorne@sheppardmullin.com
30 Rockefeller Plaza
New York, New York 10112-0015
(212) 653-8700

*Counsel for Defendant, Deloitte Consulting, LLP*

___/s Howard A. Newman/___
Howard A. Newman, Esq.

**REDACTED**