UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MULTI-STATE PARTNERSHIP FOR
PREVENTION, LLC,

                        Plaintiff,                        24-cv-9013 (PKC)

        -against-                           OPINION AND ORDER

DELOITTE CONSULTING, LLP, DOE
INDIVIDUALS I-X and ROE ENTITIES I-X,

                        Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

          Plaintiff Multi-State Partnership for Prevention, LLC ("Multi-State") is in the business of developing and selling software for the administration and tracking of vaccinations. In April and May 2020, Multi-State gave a series of presentations to officials at the Centers for Disease Control ("CDC") about its new PrepMod software product in hopes that the CDC would contract for PrepMod's use in what Multi-State expected to be a mass-vaccination response to the Covid-19 pandemic. Also attending these presentations were employees of Deloitte Consulting, LLP ("Deloitte"), which was described to Multi-State as a consultant to the CDC.

          Rather than entering into an agreement to use Multi-State's PrepMod product, the CDC entered into a sole-source contract with Deloitte in May 2020 to use a similar software product called VAMS. Multi-State asserts that Deloitte's VAMS product utilized features of PrepMod that were protected trade secrets of Multi-State. It alleges that Deloitte misappropriated these trade secrets after learning them through Multi-State's presentations. Multi-State asserts that Deloitte had agreed to maintain the confidentiality of all trade secrets

disclosed during the PrepMod presentations, and that all visual materials used in the presentations were expressly marked as confidential and proprietary.

Multi-State's Third Amended Complaint (the "TAC") brings eleven causes of action, including claims under the Defend Trade Secret Acts ("DTSA"), 18 U.S.C. § 1836(b), and section 2 of the Sherman Act, 15 U.S.C. § 2.[1]  It also brings claims under the state trade-secret statutes and the common law of Florida, Maryland, Virginia and the District of Columbia. Deloitte has filed a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P.

Deloitte advances the argument that the Court should consider certain allegations raised in the Second Amended Complaint ("SAC") rather than the TAC, which is the operative pleading in this case.  Deloitte argues that in the SAC, Multi-State failed to describe its reasonable efforts to safeguard confidential and trade-secret information prior to its disclosure to audiences affiliated with the CDC.  The TAC, however, asserts that Multi-State's audiences agreed in advance to honor the confidentiality of Multi-State's presentations.  The TAC also revises certain allegations as to the scope of Multi-State's presentations and includes greater detail about PrepMod features that are alleged to be trade secrets.  Deloitte argues that the SAC's allegations did not plausibly allege the existence of protectible trade secrets and that the TAC "brazenly contradict[s]" the SAC to such an extent that the Court should consider whether the SAC, and not the TAC, plausibly states a claim for relief.

As will be explained, Deloitte's argument fails, and the Court will consider whether the TAC plausibly states a claim for relief.  The Court does not decide at this juncture the evidentiary use, if any, that may be made of differences between the two pleadings.  For the reasons that will be explained, Deloitte's motion to dismiss will be granted as to Multi-State's

---

[1] The TAC lists twelve causes of action, but Count Five consists solely of the heading for a withdrawn RICO claim.

claims of common law trade misappropriation (Count Three), fraud (Count Nine) and monopolization or attempted monopolization under the Sherman Act (Count Twelve), as well as to those portions of its common law tort claims that are solely directed to the misappropriation of trade secrets.  The motion to dismiss will otherwise be denied.

BACKGROUND

> A.  Overview of Multi-State and Its Vaccine-Administration Software.

Multi-State is in the business of developing and selling software that tracks the delivery and administration of vaccines.  Beginning in August 2017, Multi-State owned and sold a program called Readi-Consent and ClinicWizard (the "RC-CW Software"), which the TAC calls a "mass vaccination tool."  (TAC ¶ 11.)  The RC-SW Software was well-received and won an industry award.  (TAC ¶ 12.)  From 2018 to 2020, Multi-State had discussions with state-level health officials and the CDC about the potential purchase and use of the RC-CW Software.  (TAC ¶¶ 13-15.)  The State of Maryland used the RC-CW software pursuant to an agreement with Multi-State.  (TAC ¶¶ 30, 243.)

When the Covid-19 pandemic began in early 2020, Multi-State believed that it was in a position to provide tracking and administrative software for any anticipated mass-vaccination effort.  Non-party Tiffany Tate is the sole member of the plaintiff limited liability company.  (TAC ¶ 1.)  On or around February 27, 2020, Tate completed a new software product called PrepMod, which she hoped would fix certain problems in the tracking and administration of mass vaccinations.  (TAC ¶ 20.)  Multi-State asserts that PrepMod was capable of assisting in the national coordination of an expected Covid-vaccine rollout, and that PrepMod could have given the CDC a way to track states' administration of vaccines in real time.  (TAC ¶¶ 38-39.)  The TAC characterizes PrepMod as a novel product that provided real-time data analysis and

differed from "any other known approach, tool or system for mass vaccination preparedness, tracking, and monitoring."  (TAC ¶ 51.)

B.  Multi-State's Presentations to the CDC, Deloitte and CDC Affiliates.

1.  The AIRA Presentation of April 21, 2020.

On March 13, 2020, Tate contacted the CDC about PrepMod's potential role in managing a mass-vaccination program.  (TAC ¶ 25.)  The CDC had commissioned the American Immunization Registration Association ("AIRA") to survey immunization-program managers across the country and draft a report about their mass-vaccination capabilities during the Covid pandemic.  (TAC ¶ 26.)  On April 6, 2020, AIRA contacted Tate to request a basic demonstration of Multi-State's "module/mass vaccination solution."  (TAC ¶ 27.)  The TAC asserts that AIRA was specifically interested in the RC-CW Software.  (TAC ¶ 28.)

On April 21, 2020, Tate presented the RC-CW Software to a "small number of AIRA representatives . . . ."  (TAC ¶ 32.)  The presentation included a discussion of "a subset of PrepMod's features" but not "a live demonstration of PrepMod."  (TAC ¶ 33.)  The TAC asserts that before making disclosures about the RC-CW Software and PrepMod, the AIRA representatives agreed "to keep Ms. Tate's disclosures confidential."  (TAC ¶ 35.)  Tate also advised the AIRA audience during her presentation that the presentation included proprietary, confidential and trade-secret information owned by Multi-State that could not be disclosed or used without Multi-State's authorization.  (TAC ¶¶ 34-35.)

On or about April 25, 2020, AIRA issued its report, which concluded that Multi-State's RC-CW Software was the only "functioning and fully-developed bi-directional mass vaccination application commercially available to address mass vaccination."  (TAC ¶ 41.)  The AIRA report stated that other similar products worked only at a local level.  (TAC ¶ 42.)

2.  <u>Multi-State's Presentations to the CDC and Deloitte.</u>

On April 20, 2020, a CDC official named Lynn Gibbs-Scharf urgently contacted Tate to request a demonstration of the RC-CW Software.  (TAC ¶¶ 30-31.)  On April 27, 2020, Tate met virtually with CDC officials and Deloitte employees.  (TAC ¶ 43.)  Gibbs-Scharf told Tate that Deloitte and its agents were consultants to the CDC and that Tate should "engage with Deloitte" about Multi-State's PrepMod product.  (TAC ¶ 43.)

The TAC asserts that before presenting any trade secret or confidential information to the CDC and Deloitte, both "agreed to her stated terms, including the maintaining of confidentiality of the disclosures."  (TAC ¶ 55.)  Tate's presentation of April 27, 2020 consisted of a slide deck that described the RC-CW Software and PrepMod, as well as a "workflow" that included Multi-State trade secrets.  (TAC ¶¶ 44, 46.)  Tate also gave a live demonstration of PrepMod, which allegedly disclosed proprietary information, including trade secrets.  (TAC ¶ 44.)  The presentation was "quite specific and technical," and differed from the earlier presentation to AIRA.  (TAC ¶ 45.)  The TAC asserts that all slides used in this presentation, and other visual materials later sent by Multi-State, were marked, "CONFIDENTIAL & PROPRIETARY – DO NOT SHARE."  (TAC ¶¶ 54, 70, 196, 326, 329.)

The TAC characterizes Gibbs-Scharf as "highly enthusiastic" about PrepMod. (TAC ¶¶ 47.)  The TAC alleges upon information and belief that the CDC and Deloitte expected to hear only about the RC-CW Software and were surprised to learn about PrepMod, which anticipated issues that the CDC and Deloitte had not foreseen.  (TAC ¶¶ 48-50.)  During the meeting, CDC officials acknowledged that they had no system or plan to handle the logistics of a mass-vaccination effort.  (TAC ¶ 52.)

At the end of the April 27 meeting, the CDC asked to meet with Multi-State's technical staff, view certain screenshots and obtain access to PrepMod.  (TAC ¶ 61.)  On April 28, 2020, the CDC requested a follow-up meeting and a "sandbox [i.e., a secure way to examine software and code] or at least screenshots" of PrepMod.  (TAC ¶¶ 62, 63.)

The CDC met with Tate and Multi-State's technical staff on May 5, 2020.  (TAC ¶ 72.)  Multi-State answered technical questions and supplied detailed information about PrepMod.  (TAC ¶ 74.)  Tate also discussed plans for what a national roll-out of PrepMod would entail.  (TAC ¶ 75.)  The TAC does not assert that Deloitte participated in this meeting but alleges that Deloitte "was aware and/or involved in" the CDC's "attempt to extract" more information about PrepMod.  (TAC ¶ 73.)

Tate presented additional technical details to the CDC on May 6, 2020.  (TAC ¶ 79.)  The Complaint asserts that at this point, the CDC and Deloitte had access to significant confidential, proprietary and trade-secret information concerning the workings of PrepMod, including through oral presentations and interactive discussions of highly technical details, all of which were disclosed after the CDC and Deloitte promised and agreed to maintain confidentiality.  (TAC ¶¶ 80, 82.)  The Complaint details aspects of PrepMod that are alleged to be trade secrets, broadly pertaining to its "architecture" and how certain efficiencies were achieved for a platform that was intended to administer a large, national vaccination program.[2] (TAC ¶¶ 83-100.)

---

[2] With leave of court, certain details about the alleged trade secrets are redacted from the publicly-filed version of the TAC.

C. The CDC Contracts with Deloitte to Develop
   a Mass-Vaccination Administration App.

In May 2020, the CDC made public announcements stating that it was working with a vendor to build a mass-vaccination app. (TAC ¶¶ 101-04.)  Based on her discussions with CDC officials, Tate believed that these statements referred to PrepMod and Multi-State. (TAC ¶¶ 105-06.).

Unbeknownst to Tate, on May 14, 2020, Gibbs-Scharf executed a written "Justification & Approval" ("J&A") identifying Deloitte as the contractor tasked with creating a vaccine-tracking app within a two-month period. (TAC ¶¶ 108-09, 119.)  The J&A cited Deloitte's customer-relations management platform as the reason it was best qualified to undertake the project, as well as Deloitte's app mockup. (TAC ¶ 110-12.)

Despite having executed the non-public J&A, the CDC then initiated an eight-day, non-public process to request proposals for a mass-vaccination app, without publicly soliciting proposals, as Multi-State asserts was required by law. (TAC ¶¶ 120-23.)  During this period, the CDC stopped responding to Tate's communications. (TAC ¶¶ 124-30.)

On May 27, 2020, the CDC awarded Deloitte a one-year contract worth $15,891,816.74 to create a mass-vaccination app that was similar to Multi-State's PrepMod product. (TAC ¶ 131.)  The next day, the CDC publicly announced the Deloitte contract. (TAC ¶¶ 133-34.)  The Deloitte product is known as "VAMS," short for the Vaccine Administration Management System. (TAC ¶¶ 78, 99.)

The TAC asserts that in late June 2020, Deloitte encountered problems in developing its app. (TAC ¶ 141.)  Deloitte sought Tate's help and asked her to execute a non-disclosure agreement. (TAC ¶¶ 142-43.)  Tate declined the request. (TAC ¶ 143.)  The TAC

asserts that Deloitte's app mockup post-dated Deloitte's interactions with Multi-State, including presentations and technical discussions that disclosed Multi-State's trade secrets.  (TAC ¶ 148.)

On August 5, 2020, Tate met with officials of the CDC and other federal agencies to discuss PrepMod.  (TAC ¶ 149.)  Then, on August 7, 2020, Tate observed from an information sheet disseminated by the CDC that Deloitte's VAMS product incorporated proprietary features of PrepMod.  (TAC ¶¶ 150-51.)

The CDC later made VAMS available to states at no charge, whereas Multi-State sold PrepMod to state governments at a market rate.  (TAC ¶¶ 153-54.)  In August 2020, officials from the State of Florida publicly stated that they had considered contracting with Multi-State to use PrepMod at a price of approximately $1.2 million, but chose instead to use the Deloitte product, which was available at no cost through the CDC.  (TAC ¶¶ 155-56.)  The State of Maryland, which previously used PrepMod, also switched to Deloitte's VAMS product.  (TAC ¶ 158.)  The United States later renewed its contract with Deloitte for a term from December 2022 to December 2027.  (TAC ¶ 168.)  The TAC asserts that Deloitte has been paid at least $80 million for technology that it misappropriated from Multi-State, with the potential to receive total payments of at least $138 million.  (TAC ¶ 168.)

The TAC asserts that on August 30, 2020, Multi-State gave notice to the CDC and Deloitte that they had misappropriated Multi-State's proprietary, confidential, and/or trade secret information.[3]  (TAC ¶ 160.)  The TAC asserts that Tate would never have permitted Multi-State to disclose its trade secrets or other proprietary information if she had known that Deloitte was working on its own competing product and that the CDC expected to award Deloitte a contract for such a product.  (TAC ¶ 167.)  It also alleges that the CDC's bidding process and Deloitte's

---

[3] The TAC asserts that Multi-State and Deloitte entered into an agreement to toll the running of the statute of limitations as of May 30, 2023.  (TAC ¶¶ 183-91.)

conflicts of interests did not comply with the requirements of the Federal Acquisition Regulations ("FAR").  (TAC ¶¶ 162-66.)

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Michael Grecco Productions, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).  In reviewing a Rule 12(b)(6) motion, the Court assumes all factual allegations in the complaint to be true and draws all reasonable inferences in favor of the non-moving party.  Peretti v. Authentic Brands Group LLC, 33 F.4th 131, 137 (2d Cir. 2022).

A DTSA claim is governed by the notice pleading standards of Rule 8(a), Fed. R. Civ. P.  Rocket Pharmaceuticals, Inc. v. Lexeo Therapeutics, Inc., 2024 WL 3835264, at *4 (S.D.N.Y. Aug. 14, 2024).  "The plaintiff must identify a purported trade secrets with sufficient specificity to place a defendant on notice of the bases for the claims against it and for a court to assess whether a trade secret has been plausibly alleged."  Id.

DISCUSSION.

I.      The TAC Is the Operative Pleading in this Case

Much of Deloitte's memorandum argues that the Court should, for certain purposes, treat the SAC as the operative pleading in this action and disregard the allegations of the TAC.  The crux of Deloitte's argument is that the SAC's allegations showed that Tate failed to safeguard Multi-State's claimed trade secrets, whereas the TAC contains new allegations that describe stronger measures to shield Multi-State's proprietary information.  According to Deloitte, the TAC is a "ruse" that "brazenly contradict[s]" key factual allegations of the SAC and raises new allegations that "retract" and "walk back" the purported "admissions" of the SAC.  (Def. Mem. 1-2, 6, 12.)  Deloitte also explains that the Court ought not disregard the TAC entirely, but only the subset of allegations discussed below that relate to Tate's presentations to AIRA, Deloitte and the CDC.

Multi-State filed the TAC with leave of Court after the filing of pre-motion letters required by section 3 of the undersigned's Individual Practices in Civil Cases.  (ECF 36; see also ECF 33 (Deloitte pre-motion letter); ECF 34 (Multi-State response).)  One goal of the pre-motion practice is to permit a plaintiff to cure possible pleading defects identified by a defendant, potentially obviating the need for further motion practice.  See Individual Practices § 3(A)(iv).  It was appropriate for Multi-State to amend its pleading in light of purported deficiencies identified in Deloitte's pre-motion letter, provided that its new or revised allegations comply with its obligations under Rule 11, Fed. R. Civ. P.  The TAC contains more detailed and granular allegations than the SAC, and this is consistent with the goal of the Individual Practices in endeavoring to avoid the necessity of a motion to dismiss by a curative amendment.  Here, it enabled the plaintiff to present its strongest and best allegations.

Even if it were otherwise, Deloitte dramatically overstates the differences between the two pleadings. "[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect." Tripathy v. McClowski, 2022 WL 2069228, at *2 (2d Cir. June 9, 2022) (summary order) (quotation marks omitted). This is not one of the rare circumstances where a court should disregard an amended complaint because it blatantly contradicts a prior pleading. See, e.g., Azzarmi v. Neubauer, 2024 WL 4275589, at *16 (S.D.N.Y. Sept. 24, 2024) (Karas, J.) ("'[W]here a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss and directly contradicts the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true.'") (quoting Vasquez v. Reilly, 2017 WL 946306, at *3 (S.D.N.Y. Mar. 9, 2017) (Karas, J.)). In Azzarmi, the pro se plaintiff attempted to resurrect a dismissed First Amendment retaliation claim by alleging that an individual told plaintiff that he was a NYPD officer after the previous pleading described the same individual as the employee of a private firm. 2024 WL 4275589, at *16. Similarly, in Palm Beach Strategic Income, LP v. Salzman, 2011 WL 1655575, at *5-7 (E.D.N.Y. May 2, 2011), plaintiff's first three complaints and its opposition to a motion to dismiss asserted that the parties' escrow transaction was governed by a particular contract. Without meaningful explanation, a fourth amended complaint alleged that an entirely different contract governed the transaction. Id. Judge Seybert concluded that the court could not accept as plausible the plaintiff's new allegation that a different contract governed. Id.

"The more usual and benevolent option, however, is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course." Wilson v. JPMorgan Chase Bank, N.A., 2021 WL 5179914, at *1 (S.D.N.Y. Nov. 8, 2021) (Furman, J.) (quotation marks omitted). Courts disregard the amended pleading only when the

new allegations are "blatant" or "directly contradictory" to a predecessor, not merely

"inconsistent." Id. Judge Marrero thoughtfully explained the rationale for permitting corrective

amendments after a pleading deficiency is identified:

> It is not uncommon for litigants to amend pleadings in response to deficiencies pointed out by an adversary or even by the Court, either before a dispositive motion is filed or in response to a ruling on a motion that grants leave to replead and offers specific guidance as to how any flaws in the pleadings may be cured to survive dismissal. Some such corrective amendments serve a useful purpose in avoiding unnecessary motion practice. Not surprisingly, some later pleadings made in this context necessarily may be at odds with allegations the party asserted in the original pleadings. It would be a harsh rule of law indeed if a litigant were to change a statement in an amended pleading to repair a weakness cited by an adversary or by the Court, only to have the case dismissed because the conforming change in some way may conflict with an allegation in the earlier pleadings.

Streit v. Bushnell, 424 F. Supp. 2d 633, 640 n.4 (S.D.N.Y. 2006).

The TAC revises and expands upon certain allegations contained in the SAC

regarding Tate's presentation to AIRA on April 21, 2020. Deloitte argues that the SAC

described Tate voluntarily disclosing alleged trade secrets to the AIRA audience without any

agreement to maintain their confidentiality, thus extinguishing the trade-secret protections

claimed by Multi -State. (ECF 33 at 5; Def. Mem. at 5-6.)

The SAC and TAC also make somewhat different allegations about AIRA's

agreement to Multi-State's confidentiality requirements. The SAC asserts that Tate "advised"

the AIRA audience that she would be presenting confidential information owned by Multi-State

that could not be used or made public without Multi-State's express authorization. (SAC ¶ 30.)

Deloitte argues that such an admonition, standing alone, does not demonstrate an agreement to

maintain confidentiality. (Def. Mem. at 5.) The TAC, by contrast, specifies that before the

presentation, "AIRA representatives agreed to Ms. Tate's terms, including to keep Ms. Tate's

disclosures confidential." (TAC ¶ 35.) The TAC's new assertion that AIRA representatives agreed to keep Tate's disclosures confidential is more consistent with an agreement that the audience would maintain confidentiality but it also does not contradict the SAC's assertion that Tate orally advised the audience that the presentation's contents could not be made public or used without Multi-State's express authorization. (TAC ¶ 35; SAC ¶ 30.)

Deloitte also points out slight variations in how the two pleadings describe the contents of Tate's AIRA presentation. The SAC alleged that at the April 21, 2020 presentation to AIRA, Tate specifically discussed PrepMod's capabilities and reporting options, whereas the TAC asserts that Tate more broadly discussed Multi-State's capabilities and reporting options. (SAC ¶¶ 24-25; TAC ¶ 27.) The SAC asserted that at this presentation, Tate demonstrated PrepMod to the audience. (SAC ¶ 29.) The TAC instead asserts that Tate demonstrated the RC-CW Software but also discussed PrepMod and "talked about a subset of [its] features." (TAC ¶¶ 32-33.) Deloitte makes much of the TAC's broader description of the subject matter presented to AIRA, as opposed to the SAC's emphasis on PrepMod, but the TAC's assertion that Tate talked about "a subset of PrepMod's features" is a modest revision to the SAC's allegation that she "gave a live demonstration of PrepMod to AIRA." (TAC ¶ 33; SAC ¶ 29.) Both descriptions can be fairly characterized as open-ended.

Separate from the presentation of April 21, 2020, the TAC expands upon prior allegations about Tate's presentation to the CDC and Deloitte and April 27, 2020. It brings a new allegation specifying that her presentation to the CDC and Deloitte was more technical and specific than the presentation to AIRA. (TAC ¶¶ 45-46.) It provides greater detail on that April 27, 2020 presentation: whereas the SAC stated that Tate presented a "workflow" and "a slide presentation and a live demonstration" of PrepMod that contained trade secrets and other

- 13 -

confidential information, the TAC adds that "many" of the confidential disclosures, including trade-secret information, were delivered orally.  (SAC ¶¶ 37-38; TAC ¶¶ 44, 80.)  The TAC includes greater detail about the contents of the alleged confidential information disclosed by Multi-State.  (TAC ¶¶ 80-100.)  The TAC's descriptions of the April 27, 2020 meeting with the CDC and Deloitte principally add detail as to the claimed trade secrets at issue while asserting that the presentation had a substantial oral component and was not limited to prepared materials.  (TAC ¶¶ 44-46, 80-100; SAC ¶¶ 37-38.)

The TAC's relatively modest and targeted amendments bear little resemblance to the irreconcilable pleadings of Azzarmi and Palm Beach, which rendered the new or revised allegations of the amended pleadings implausible on their face.  The TAC is the operative pleading on this motion, see Tripathy, 2022 WL 2069228, at *2, and the Court will consider whether its non-conclusory factual allegations plausibly state a claim for relief.

II.      Deloitte's Motion to Dismiss the DTSA Claim Will Be Denied.

A.  The DTSA and a Claim for the Misappropriation of Trade Secrets.

The DTSA establishes a cause of action for the "owner of a trade secret that is misappropriated . . . ." 18 U.S.C. § 1836(b)(1).  A trade secret is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information" that (1) "the owner thereof has taken reasonable measures to keep such information secret," and (2) has independent economic value because it is not "generally known."  18 U.S.C. § 1839(3).  "Misappropriation" is defined to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  18 U.S.C. § 1839(5)(A).  It also includes "disclosure or use of a trade secret of another without express or implied consent" in certain defined circumstances.  18 U.S.C. § 1839(5)(B).  "To state

a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that

(1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." Inv. Sci,

LLC v. Oath Holdings Inc., 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021) (Daniels, J.).

        B.   The Complaint Plausibly Alleges the
            Existence of Protectible Trade Secrets.

Deloitte argues that the TAC does not plausibly identify "a single piece of actual

technology that was taken and used" and instead describes unprotectible ideas that were

allegedly misappropriated by Deloitte. (Def. Mem. 17.)

Under the DTSA, "a claimant bears the burden of identifying a purported trade

secret with sufficient specificity." Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto

Grp., Inc., 68 F.4th 792, 800 (2d Cir. 2023). "The existence of a trade secret, including whether

it was adequately identified, is a fact-specific question to be decided on a case-by-case basis."

Id. at 801 (quotation marks omitted). The Second Circuit "has not squarely articulated the

precise contours of the specificity requirement in the context of trade secrets . . . ." Id. at 801 n.9

(quotation marks omitted).

"Though the question of whether proprietary information qualifies as a trade

secret is ordinarily a question of fact not resolvable on a motion to dismiss, courts dismiss claims

involving trade secrets where they are not actually secret or there is no discernible economic

value from them not being generally known." Amimon Inc. v. Shenzhen Hollyland Tech Co.,

2021 WL 5605258, at *10 (S.D.N.Y. Nov. 30, 2021) (Ramos, J.) (citing Zirvi v. Flatley, 433 F.

Supp. 3d 448, 465 (S.D.N.Y. 2020) (Koeltl, J.)). "Numerous courts in this district have

concluded that[ ] when . . . the idea for a product would be 'clear and easy to ascertain' when the

'product is placed on the market,' that idea 'is not entitled to trade secret protection.'" Primula

Mgmt., LLC v. Primrose Sch. Franchising Co. LLC, 2026 WL 508755, at *11 (S.D.N.Y. Feb.

24, 2026) (quoting Hayden v. Int'l Bus. Machines Corp., 2025 WL 1697021, at *17 (S.D.N.Y. June 17, 2025) (Briccetti, J.)); see also LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 499 (S.D.N.Y. 2002) ("Because the software architecture cannot remain secret once it is marketed, it cannot rise to the level of a trade secret, as a matter of law.") (Scheindlin, J.).

For example, in My Mavens, LLC v. Grubhub, Inc., 2023 WL 5237519, at *6 (S.D.N.Y. Aug. 14, 2023), plaintiff claimed trade secret protections for "Proprietary Functionalities" contained in written plans for its restaurant-ordering website.  These included discounts to patrons who first reviewed a menu item or ordered from a restaurant, letting patrons filter menu items by dietary preference, and "happy hour deals."  Id.  Judge Gardephe concluded that these "concepts and ideas" did not plausibly allege protectible trade secrets.  Id. at *19.  He proceeded to explain that any user of plaintiff's proposed website would have encountered the features alleged to be trade secrets, and distinguished these features from misappropriated source code or internal software processes that were not readily identifiable.  Id. at *20.

Deloitte argues that PrepMod's claimed trade secrets are analogous to those described in My Mavens, but the TAC's allegations bear little resemblance to the purported trade secrets described in that case.[4]  First, Multi-State describes an aspect of PrepMod's "architecture and accessibility" that it asserts is not discernable to "an outsider" using PrepMod but which was incorporated into Deloitte's VAMS product.  (TAC ¶¶ 88-90.)  Second, it asserts that PrepMod's "end-to-end" features used trade secrets not known to the public, and that the features' disclosure gave Deloitte a "significant jumpstart" and "roadmap" to building its VAMS product.  (TAC ¶¶ 91-93.)  The TAC specifies that Multi-State claims trade secret protection for "how this

---

[4] Certain details of the alleged trade secrets are redacted in the version of the TAC that is posted to the public docket.  At this stage of the litigation, the Court summarizes them at a level of generality consistent with the unredacted allegations.

unification and these efficiencies were achieved, architecturally within PrepMod . . . ."  (TAC ¶ 93; emphasis in original.)  Third, it asserts that PrepMod had novel and useful data-management and information features, and that Multi-State disclosed to Deloitte "architecturally how" these features were put in place.  (TAC ¶¶ 94-97; emphasis in original.)  Fourth, it asserts that Multi-State discussed and showed to Deloitte the "back-end developer interface" of PrepMod, which a PrepMod user or licensee would not be able to discern.  (TAC ¶ 98.)  The TAC asserts that these features, both individually and in combination, were trade secrets.  (TAC ¶ 99.)

Accepting the truth of Multi-State's non-conclusory factual allegations, the TAC has plausibly alleged the existence of protectible trade secrets.  As alleged in the TAC, the features described by Multi-State do not resemble the user-facing features that would be obvious to any consumer of the product, as was the case in My Mavens.  Additionally, Deloitte argues that a Multi-State "flow chart" is not a protectible trade secret because it is obvious and widely known that vaccinations require appointment and reporting.  (Def. Mem. 16.)  But the TAC does not use the term "flow chart."  It often references a "workflow," (e.g., TAC ¶¶ 51, 77) but whether that is the same thing as a "flow chart" and what precisely the workflow entailed is unclear.  Deloitte also argues that PrepMod's interface could not be a protectible trade secret because such an interface becomes apparent once a product hits the market.  (Def. Mem. 16.)  The TAC, however, cites the protectability of "Prep-Mod's back-end developer interface" and asserts that a user or licensee would not be able to access that interface.  (TAC ¶ 98; emphasis added.)

Whether these PrepMod features ultimately constitute protectible trade secrets is more properly decided on a factual record after the close of discovery.  Deloitte's motion to

dismiss Multi-State's trade secret claims on the basis that the invoke trade secret protections for non-protectible ideas will be denied.

      C.  The Complaint's Factual Allegations Plausibly Describe
           Deloitte's "Use" of Multi-State's Trade Secrets.

Deloitte also argues that the TAC does not plausibly allege that Deloitte made use of Multi-State's claimed trade secrets.

The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or, alternatively, the "disclosure or use of a trade secret of another without express or implied consent . . . ." 18 U.S.C. § 1839(5). "The statute therefore contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d 328, 389 (S.D.N.Y. 2023) (quotation marks omitted). Though not defined by statute, one court has defined "use" to mean "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant, including marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret." Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd., 108 F.4th 458, 484 (7th Cir. 2024) (quotation marks omitted).

The TAC describes a proprietary PrepMod data-management feature that allegedly was not discernable to PrepMod users that was incorporated into VAMS in a publicly-discernable way. (TAC ¶ 88.) The TAC also asserts that proprietary, technical aspects of how PrepMod performs certain functions – as opposed to those functions themselves – were used in

the VAMS product.  (TAC ¶¶ 92-98.)  It asserts that Multi-State disclosed these technical details

to Deloitte.  (TAC ¶ 151.)

Accepting the truth of the TAC's non-conclusory factual allegations, it plausibly

alleges that Deloitte's VAMS product uses Multi-State's alleged trade secrets.

### D. The TAC Identifies Reasonable Measures to Safeguard Multi-State's Trade Secrets.

A plaintiff also must plausibly allege that it took "reasonable measures" to

maintain the secrecy of its claimed trade secrets.  Mason v. Amtrust Financial Services, 848 Fed.

App'x. 447, 450 (2d Cir. 2021) (summary order).  While "absolute secrecy is not required, a

trade secret must be veiled in sufficient secrecy that except by use of improper means, there

would be difficulty in acquiring the information."  Town & Country Linen Corp. v. Ingenious

Designs LLC, 556 F. Supp. 3d 222, 258 (S.D.N.Y. 2021) (Liman, J.) (internal quotation and

alterations omitted).  "[G]iven that trade secrets may appear in a wide variety of forms and types,

what measures are reasonable must depend in significant part on the nature of the trade secret at

issue."  Turret Labs USA, Inc. v. CargoSprint, LLC, 2022 WL 701161, at *2 (2d Cir. Mar. 9,

2022) (summary order) (internal citation and quotation omitted).  Whether a protective measure

was "reasonable" is a case-specific inquiry that may be best left to a jury.  Better Holdco, Inc. v.

Beeline Loans, Inc., 666 F. Supp. 3d 328, 385 (S.D.N.Y. 2023) (Cronan, J.).

Deloitte argues that the SAC fails to allege "reasonable measures" without

addressing the allegations of the TAC.  (Def Mem. at 2, 13-14.)  The Court concludes that the

TAC describes reasonable measures by Multi-State in the form of obtaining the oral agreement

of AIRA, CDC and Deloitte representatives to honor Multi-State's request for confidentiality and

by marking slides and other materials "CONFIDENTIAL & PROPRIETARY—DO NOT

SHARE."  Moreover, given the context-specific nature of the inquiry, it is relevant that Multi-

State's presentations to the CDC, AIRA and Deloitte were made to governmental and government-adjacent audiences during the early weeks of the Covid-19 pandemic, in connection with a public-health emergency and a then-hypothetical nationwide vaccination campaign managed by the CDC.  The TAC also cites to FAR regulations that it claims limit an existing consultant's use of trade secrets.  (TAC ¶¶ 57, 59.)  What constitutes "reasonable measures" in such a situation, including spoken agreements or broad advisories of a material's confidential or trade-secret contents, may be different than the measures required in, for example, a commercial negotiation or employment setting.

The Court therefore concludes that the TAC plausibly alleges that Multi-State took reasonable measures to safeguard its trade secrets.

III.    The Uniform Trade Secret Acts Claim Survives.

The Complaint also brings a claim under the Uniform Trade Secret Acts ("UTSA") of the states of Maryland, Florida, Virginia and the District of Columbia.  (TAC ¶¶ 222-25.)  Courts have consistently concluded that claims brought under state statutes analogous to the DTSA can be analyzed in tandem with a DTSA claim.  See, e.g., Rozdilsky v. Liquidity Servs., Inc., 2026 WL 482940, at *12 (D. Md. Feb. 20, 2026) (analyzing DTSA claim with its Maryland analogue) (collecting cases); Fortun Ins., LLC v. Rouco, 2025 WL 936707, at *6 (S.D. Fla. Mar. 25, 2025) (analyzing DTSA claim with its Florida analogue) (collecting cases); Synopsys, Inc. v. Risk Based Sec., Inc., 2022 WL 3005990, at *13 n.40 (E.D. Va. July 28, 2022) (analyzing DTSA claim with its Virginia analogue) (collecting cases); Clevinger v. Advocacy Holdings, Inc., 2024 WL 3359508, at *8 (D.D.C. July 10, 2024) ("The elements of trade secret misappropriation are identical under federal and D.C. law.").  Accordingly, the Court's analysis

of the DTSA claim also applies to Multi-State's claims brought under the laws of the three states and the District of Columbia.

For substantially the same reasons that Multi-State's DTSA claim survives Deloitte's motion to dismiss, its claim under the UTSAs of Florida, Maryland, Virginia and the District of Columbia also survives.

IV.    The Claim for Common Law Misappropriation of Trade Secrets Will Be Dismissed.

Counts Three of the TAC brings a claim of "common law misappropriation of trade secrets."  (TAC ¶¶ 230-40.)  Deloitte argues that the trade secret statutes of Maryland, Florida, Virginia and the District of Columbia expressly preempt common law claims directed to the misappropriation of trade secrets.  See Md. Code Ann., Com. Law § 11-1207(a) ("this subtitle displaces conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a trade secret."); Fla. Stat. Ann. § 688.008(1) (trade secret statutes "displace conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret."); Va. Code Ann. § 59.1-341(A) ("this chapter displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret."); D.C. Code Ann. § 36-407(a) ("this chapter supersedes conflicting tort, restitution and other law of the District of Columbia providing civil remedies for misappropriation of a trade secret.").

In response, Multi-State "acknowledges" that this claim "is likely preempted" by both the DTSA and the state preemption statutes.  (Opp. Mem. at 21 n.5.)  Multi-State does not otherwise address the argument.

The motion to dismiss Count Three will be granted.

V.    Multi-State's Other Common Law Claims
      Are Not Entirely Preempted.

The TAC also brings common law claims for the misappropriation of confidential information (Count Four), tortious interference (Count Six), unfair competition (Count Seven), fraud (Count Eight), civil conspiracy (Count Nine) and unjust enrichment (Count Ten).

Deloitte argues that these claims are preempted "in whole or in part" by the preemption provisions quoted above under the UTSAs of Florida, Maryland, Virginia and the District of Columbia.  See Md. Code Ann., Com. Law § 11-1207(a); Fla. Stat. Ann. § 688.008(1); Va. Code Ann. § 59.1-341(A); and D.C. Code Ann. § 36-407(a).

In reviewing whether a common law claim is preempted, a court looks to "whether allegations of trade secret misappropriation alone comprise the underlying wrong . . . ." Carlwood Safety, Inc. v. Wesco Distribution, Inc., 446 F. Supp. 3d 970, 977 (M.D. Fla. 2020) (applying Fla. Stat. Ann. § 688.008); see also Aarow Elec. Sols. v. Tricore Sys., LLC, 693 F. Supp. 3d 525, 536 (D. Md. 2023) ("civil claims based on non-trade secret information are not preempted by MUTSA's preemption provision.") (applying Md. Code Ann., Com. Law § 11-1207); Space Sys./Loral, LLC v. Orbital ATK, Inc., 306 F. Supp. 3d 845, 856 (E.D. Va. 2018) ("Civil remedies not exclusively based on the misappropriation of a trade secret are not preempted.") (applying Va. Code Ann. § 59.1-341).

Count Four, which asserts the common law misappropriation of confidential information, distinguishes allegedly confidential information from information that is claimed to be a trade secret, including Multi-State's "proposal and price quote to the CDC," which Deloitte allegedly used in its own proposal.  (TAC ¶ 237.)  Certain PrepMod features described as "confidential" also overlap word-for-word with features described elsewhere as trade secrets. (TAC ¶¶ 232-34, 92, 96.)  But a claim involving misappropriation of confidential information

may be pleaded in the alternative to a claim premised on trade-secret status without being subject to preemption.  See, e.g., Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc., 190 F. Supp. 2d 785, 802 (D. Md. 2002) (applying Md. Code Ann., Com. Law § 11-1207); Smart Team Glob., LLC v. HumbleTech LLC, 2020 WL 2836465, at *2-3 (S.D.N.Y. June 1, 2020) (denying motion to dismiss common law claims incorporating misappropriation of confidential information because they were pleaded in the alternative to trade-secrets claims) (Nathan, J.) (applying Va. Code Ann. § 59.1-341).  Because Count Four is not based on the misappropriation of trade secrets, the motion to dismiss Count Four will be denied.

To the extent that Multi-State's claims of tortious interference (Count Six), unfair competition (Count Seven), fraud (Count Eight), civil conspiracy (Count Nine) and unjust enrichment (Count Ten) are premised on the misappropriation of trade secrets, those portions of the claims will be dismissed as preempted.

But each of these claims also cites to the alleged misappropriation of Multi-State's confidential information, which is an alternative theory of liability and falls outside the reach of the preemption statutes.  To the extent that these claims do not rely entirely on the misappropriation of trade secrets, the motion to dismiss them will be denied.  See, e.g., Aarow, 694 F. Supp. 3d at 537 (common law claims of unfair competition, civil conspiracy, tortious interference and breach of fiduciary duty were not preempted to the extent that they did not implicate trade secrets); Congruex, LLC v. CCU, LLC, 2026 WL 607613, at *3 (S.D. Fla. Mar. 4, 2026) ("it would be hasty of us to dismiss the Tort Claims when, later in the case, we may determine that FUTSA doesn't even apply."); Hardwire, LLC v. Ebaugh, 2020 WL 5077469, at *4 (D. Md. Aug. 27, 2020) ("Courts in this District have held that plaintiffs may plead in the alternative under the liberal federal pleading standards that misappropriated confidential

information is not a trade secret, and as such, common law claims relating to such confidential information are not preempted by MUTSA."); Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co., 191 F. Supp. 2d 652, 659 (E.D. Va. 2002) ("because it cannot be established at this juncture whether the confidential information at issue in this case is a trade secret, the Court cannot find that [plaintiff's] alternative claims are preempted.").

The motion to dismiss Multi-State's common law claim for the misappropriation of confidential information (Count Four) will be denied in its entirety.  The motion to dismiss Multi-State's claims of tortious interference (Count Six), unfair competition (Count Seven), fraud (Count Eight), civil conspiracy (Count Nine) and unjust enrichment (Count Ten) will be granted to the extent that they are premised on the misappropriation of trade secrets but otherwise denied.

VI.     The Motion to Dismiss the Breach of
        Contract Claim Will Be Denied.

Count Eleven asserts that Deloitte breached an oral contract to maintain the confidentiality of Multi-State's confidential and trade secret information.  (TAC ¶¶ 302-14.)  It asserts that "it was agreed and understood, either expressly or impliedly, by those present, including Deloitte . . . that as a condition to being given access to [Multi-State's] trade secrets and other confidential information, the recipients would maintain the confidentiality of [Multi-State's] confidential disclosures and would not use [Multi-State's] trade secret and other confidential and proprietary information for any other purpose than evaluating [Multi-State] as the potential provider for the CDC's needs."  (TAC ¶ 306.)  It asserts that Deloitte breached this agreement by using Multi-State's trade secret and confidential information in its VAMS product. (TAC ¶¶ 310, 312.)  The TAC also cites provisions of the FAR regulations that it contends

required Deloitte to agree to maintain confidentiality and non-use of Multi-State's information. (TAC ¶¶ 308-09.)

Deloitte does not urge that the breach of contract claim is preempted, and the relevant statutes all use identical language to provide that their scope "does not affect" "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret . . . ."  Md. Code Ann., Com. Law § 11-1207(b)(1); Fla. Stat. Ann. § 688.008(2)(a); Va. Code Ann. § 59.1-341(B)(1); D.C. Code Ann. § 36-407(b)(1).

"An oral contract, such as the one in this case, is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms."  St. Joe Corp. v. McIver, 875 So. 2d 375, 381 (Fla. 2004); accord Dean v. Morris, 287 Va. 531, 536 (2014); Royal Inv. Grp., LLC v. Wang, 961 A.2d 665, 680-81 (Md. Ct. Spec. App. 2008); Strauss v. NewMarket Glob. Consulting Grp., LLC, 5 A.3d 1027, 1032 (D.C. 2010).  The TAC includes facts that plausibly allege that Deloitte, in its role as CDC consultant, agreed to honor Multi-State's confidentiality as a condition to obtaining details about PrepMod in order to evaluate Multi-State "as the potential provider for the CDC's needs."  (TAC ¶ 306.)  It alleges that Deloitte breached that oral agreement by wrongfully using Multi-State's confidential and trade-secret information.  (TAC ¶¶ 310, 312.)  At the pleading stage, Deloitte had plausibly alleged the existence of an oral contract and a breach of its terms.

To the extent that Deloitte argues that the claim should be dismissed because Multi-State has not alleged the existence of trade secrets or their use by Deloitte, the motion will be denied for the reasons already discussed.

The motion to dismiss the breach of contract claim will be denied in its entirety.

VII.    The Complaint Does Not Allege Fraud with
        the Particularity Required by Rule 9(b).

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  It "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  Financial Guaranty Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 403 (2d Cir. 2015).  "The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."  United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 25-26 (2d Cir. 2016) (quotation marks omitted).  Courts must "recognize and rigorously enforce these salutary purposes of Rule 9(b)."  Id. at 26.

"Fraud liability can . . . be premised on statements that are misleading because they omit other material information."  Prentice v. R.J. Reynolds Tobacco Co., 338 So. 3d 831, 838 (Fla. 2022).  "Concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud.  Proof of fraud by nondisclosure requires evidence of a knowing and a deliberate decision not to disclose a material fact.  Further, in Virginia, silence does not constitute concealment in the absence of a duty to disclose."  Doe v. Baker, 299 Va. 628, 655 (2021) (internal citation and quotation marks omitted); accord Green v. H & R Block, Inc., 355 Md. 488, 525 (1999) (plaintiff must allege that "(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the

- 26 -

plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.").

The fraud claim asserts that "Deloitte and the CDC" concealed from Multi-State that Deloitte was its commercial rival and not merely a consultant. (TAC ¶ 263.) It asserts that "Deloitte and the CDC" knowingly made false representations "for the purpose of defrauding" Multi-State and obtaining its confidential and trade-secret information, and that Multi-State reasonably relied on the misrepresentations and omissions. (TAC ¶¶ 265-67.) It asserts that "the CDC and Deloitte" falsely told Multi-State that they would respect Multi-State's confidential and trade-secret information. (TAC ¶ 269.)

Multi-State's allegations fall short of pleading fraud with particularity. The TAC engages in improper group pleading by repeatedly asserting that "Deloitte and the CDC" committed an act of fraud without attributing any particular statement to Deloitte. (TAC ¶¶ 262-70.) The repeated grouping together of Deloitte and the CDC does not satisfy the particularity required of Rule 9(b) or give notice to Deloitte of what fraudulent conduct is asserted against it. See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Surgalign Spine Techs., Inc., 2024 WL 477031, at *4 (S.D.N.Y. Feb. 7, 2024) ("It is well-established in this Circuit that plaintiffs cannot simply 'lump' defendants together for pleading purposes. Plaintiffs must satisfy Rule 9(b) as to each defendant, and cannot do so by making vague allegations about the defendants as a unit.") (Rochon, J.) (internal citation and quotation marks omitted).

Further, the TAC does not identify with particularity any written or oral statement made on behalf of Deloitte. It does not identify by name or title any Deloitte representative who interacted with Multi-State. It does not identify any fraudulent statement or omission by Deloitte, identify any person who spoke on behalf of Deloitte, and does not identify where and

when any allegedly fraudulent statement or omission was made by Deloitte.  See Financial

Guaranty Ins. Co., 783 F.3d at 403.

Because it does not plead fraud with the particularity required by Rule 9(b),

Multi-State's fraud claim will be dismissed.

VIII.   The Complaint Does Not Plausibly
        Allege a Sherman Act Violation.

Count Twelve asserts that Deloitte has unlawfully monopolized or attempted to

monopolize "the market for a national, federally-adopted mass vaccination application for

registering, administering, and reporting COVID vaccinations" in violation of section two of the

Sherman Act, 15 U.S.C. § 2.  (TAC ¶¶ 315-54.)  This claim will be dismissed because the TAC

does not plausibly allege that Multi-State has antitrust standing and also fails to plausibly allege

a relevant product market or facts plausibly showing Deloitte's monopoly power.

A.   Multi-State Does Not Plausibly Allege Its Antitrust Standing.

A private plaintiff must demonstrate that it has standing under the federal antitrust

laws.  DirecTV, LLC v. Nexstar Media Grp., Inc., 162 F.4th 295, 308 (2d Cir. 2025).  It must

show that "it suffered a special kind of antitrust injury" that is "of the type the antitrust laws were

intended to prevent and that flows from that which makes or might make defendants' acts

unlawful."  Id. at 308-09 (quotation marks omitted).  "An antitrust injury 'should reflect the

anticompetitive effect either of the violation or of anticompetitive acts made possible by the

violation.'"  Id. at 309 (quoting Gelboim v. Bank of America Corp., 823 F.3d 759, 772 (2d Cir.

2016)).  "[B]ecause the antitrust laws protect competition, not competitors, a plaintiff must show

that more than its own business suffered; it must ultimately show that the challenged action

harmed consumers."  MacDermid Printing Solutions LLC v. Cortron Corp., 833 F.3d 172, 187

(2d Cir. 2016) (quotation marks omitted).

Multi-State has not identified harm to consumers or competition, as opposed to harm to itself.  The allegations cited in support of its Sherman Act claim summarize the features of PrepMod and the RC-CW Software and the allegations as to how Deloitte allegedly obtained plaintiff's trade secrets.  (TAC ¶¶ 319-42.)  It emphasizes Deloitte's breach of purported confidentiality obligations to Multi-State and its monetizing of Multi-State's proprietary information.  (TAC ¶¶ 344-46.)  These allegations are consistent with the types of business torts previously discussed and not the harm to competition required by the Sherman Act.

The TAC states that unnamed third-party software companies similar to Deloitte were prevented from bidding with the CDC based on Deloitte's anticompetitive conduct, that Deloitte worked with the CDC to obtain Multi-State's proprietary information, and that Deloitte violated section 2 through a scheme to exclude potential rivals and "remove" Multi-State as the "principal provider" of a mass-vaccination management application.  (TAC ¶¶ 350-52.)  It also cites the existence of Deloitte's "sole-source contract" with the CDC.  (TAC ¶¶ 352-53.)  But its allegations continue to describe the factual circumstances surrounding Deloitte's alleged misappropriation of Multi-State's information, accompanied by stray antitrust terminology.  It does not describe the competitive landscape for vaccine-administration software, aside from a vague reference to unnamed third parties that "could have been working toward" a product similar to PrepMod or VAMS.  (TAC ¶ 346; see also TAC ¶ 347 (referencing unnamed "competitors and potential competitors" that may have obtained "market share" but-for Deloitte's alleged conduct).)

And rather than identify consumer harm, the TAC actually describes a benefit to the state governments that were consumers because Deloitte's VAMS product was made available to states at no cost.  (TAC ¶ 351.)  It is true that a firm may sometimes engage in

predatory pricing by dropping prices to forgo short-term profits in order to undercut rivals and obtain monopoly profits in the long term. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 589 (1986). But there is no suggestion that Deloitte engaged in such a pricing tactic with its VAMS product, which the TAC explains was made available to state officials at no cost as part of a CDC initiative.[5] (TAC ¶¶ 246, 259 ("Whereas MSPP charged fees for PrepMod, CDC made the competing VAMS product available at no cost to states.").) Nor does the TAC assert that Deloitte's sole-source contract with the CDC was based on a predatory bid. See, e.g., Irvin Indus., Inc. v. Goodyear Aerospace Corp., 974 F.2d 241, 245 (2d Cir. 1992).

Because the Multi-State has not plausibly alleged antitrust standing, its Sherman Act claim will be dismissed.

B. Multi-State Does Not Plausibly Allege a Relevant Product Market.

Even if the TAC plausibly alleged antitrust injury, the claim would be dismissed because it does not allege the existence of a relevant product market.

"Section 2 of the Sherman Act provides that it is unlawful to 'monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations.' 15 U.S.C. § 2. '[T]his offense requires, in addition to the possession of monopoly power in the relevant market, the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" In re Adderall XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir.

---

[5] To the extent that the monopolization claim is premised on advantages conferred by Deloitte's contract with the CDC, it likely would be barred by principles of immunity that apply to conduct overseen and monitored by a federal agency. See, e.g., In re Stock Exchanges Options Trading Antitrust Litig., 317 F.3d 134, 147 (2d Cir. 2003); Name.Space, Inc. v. Network Sols., Inc., 202 F.3d 573, 582 (2d Cir. 2000). The Court need not reach the issue here, however.

2014) (quoting Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004)).  "[I]t is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

"For a monopoly claim '[t]o survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible.'"  Chapman v. New York State Div. for Youth, 546 F.3d 230, 237 (2d Cir. 2008) (quoting Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)).  Because market definition "is a deeply fact-intensive inquiry," courts should hesitate to grant a motion to dismiss where a market is plausibly defined by the pleader but its existence is disputed by the movant.  Id. at 238.  At the same time, where a "plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."  Id.; see also Amigo Shuttle Inc. v. Port Auth. of New York & New Jersey, 2025 WL 2618862, at *3 (2d Cir. Sept. 11, 2025) ("Dismissal on the pleadings is appropriate when a plaintiff 'fail[s] even to attempt a plausible explanation as to why a market should be limited [or defined] in a particular way.'") (summary order) (brackets in original; quoting Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001)).

The TAC does not plausibly allege a relevant product market.  It asserts that Deloitte acted with the "intent to procure and maintain a monopoly in the market for a national, federally-adopted mass vaccination application for registering, administering, and reporting COVID vaccinations . . . ."  (TAC ¶ 317.)  The TAC makes no reference to product interchangeability, elasticity of demand, or the existence of interchangeable substitute products. It is not apparent why a "federally-adopted mass vaccination application" is a relevant product market, given that the TAC makes it apparent that such applications are also used at the state and local levels.  (See, e.g., TAC ¶¶ 30, 42, 89, 146 (referencing "local users of self-developed or procured mass vaccination modules"), 159.)

Multi-State's supporting allegations describe an entirely different arm of Deloitte's business, referred to as "eligibility systems contracts," a market allegedly valued at around $6 billion that involved the design and development of "state-owned systems" performed by Deloitte on a state-by-state basis.  (TAC ¶ 318.)  In its opposition memorandum, Multi-State clarifies that states use this product to track Medicaid eligibility.  (Opp. Mem. 25.)  There is no plausible connection between that product and the TAC's description of VAMS and PrepMod.

In its opposition memo, Multi-State proposes an entirely different market definition, consisting of "mass vaccination modules with emergency preparedness tools . . . ." (Opp. Mem. 24.)  But "a party cannot amend its pleadings through a brief . . . ." Alaska Elec. Pension Fund v. Bank of Am. Corp., 306 F. Supp. 3d 610, 625 (S.D.N.Y. 2018) (Furman, J.). Even if the Court were to consider this definition, Multi-State's memorandum does not explain what this market would entail in a manner consistent with Chapman, 546 F.3d at 237.

The TAC does not attempt to plausibly allege why the relevant product market should be limited or defined as a national, federally-adopted mass vaccination application for

registering, administering, and reporting COVID vaccinations.  See, e.g., Amigo Shuttle, 2025 WL 2618862, at *3.  Because the TAC does not plausibly allege the existence of a relevant product market, the claim of monopolization and attempted monopolization will be dismissed.

C.  Multi-State Does Not Plausibly Allege Monopoly Power.

Monopoly power includes "the power to control prices or exclude competition." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 107 (2d Cir. 2002).  Monopoly power can also be proved by showing "excess" market share.  Id.

A theory of monopoly power turns heavily on the plaintiff's ability to show a relevant market, see id. at 108-09.  Because the TAC fails to plausibly allege the existence of a relevant product market, it cannot plausibly allege that Deloitte had monopoly power in a relevant product market.  While the TAC alleges that the CDC's contract with Deloitte excluded Multi-State and unidentified third-party software companies from a federally adopted mass-vaccination software market (TAC ¶ 351), this seems to be a byproduct of the CDC's use of a sole-source contract.  To the extent that the TAC asserts that Deloitte obtained that contract by misappropriating plaintiff's trade secrets, that describes a separate tort, not the use of monopoly power to exclude competition.

Because the TAC does not plausibly allege that Deloitte had monopoly power in a relevant product market, the monopolization claim will be dismissed.

CONCLUSION.

The motion to dismiss is GRANTED in its entirety as to Count Three (common law misappropriation of trade secrets), Count Eight (fraud) and Count Twelve (monopolization and attempted monopolization).

It is GRANTED IN PART as those portions of Count Six (tortious interference), Count Seven (unfair competition), Count Nine (civil conspiracy) and Count Ten (unjust enrichment) that are premised on the misappropriation of trade secrets but DENIED as to the remainder of those claims.

It is DENIED in its entirety as to Count One (DTSA), Count Two (state trade-secret statutes), Count Four (common law misappropriation of confidential information) and Count Eleven (breach of contract).

The Clerk is respectfully directed to terminate the motion.  (ECF 48.)

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
       April 28, 2026